IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CARLTON HART,                          )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )
                                       )
CHRISTINE MANNINA, *et al.*,           )  Cause No. 1:10-CV-1691-WTL-DML
                                       )
        Defendant.                     )

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff Carlton Hart, by counsel, respectfully requests the Court deny Defendants Christine Mannina, Lesia Moore, Jeff Breedlove, Tom Tudor, William Benjamin, Kevin Kelly, Chief Paul Ciesielski, Director Frank Straub, Mayor Gregory Ballard, the Indianapolis Department of Public Safety, and the City of Indianapolis' (collectively "Defendants") Motion for Judgment on the Pleadings ("Motion").[1]

## I.  Introduction

For the sake of a reality television show, Carlton Hart languished in the Marion County Jail for 687 days, charged with a capital crime he did not commit. The detectives responsible for Mr. Hart's arrest and incarceration were not simply public servants, but paid actors who wanted to generate stories worthy of primetime television – to close cases, even if that meant sacrificing an innocent citizen. Nor were they simply rogue officers, as their supervisors were directly involved with and participated in the show.  The City of Indianapolis compelled these officers in 2009 to enter into their contracts with the production company.  Without the detectives'

---

[1] The Motion was additionally filed on behalf of non-party Indianapolis Metropolitan Police Department ("IMPD"). The IMPD was a defendant in Mr. Hart's original complaint, but was removed as a party when Mr. Hart filed his Amended Complaint, because the Defendants argued that IMPD cannot be sued as an entity separate from the City of Indianapolis, which is liable for the actions of the IMPD. *See* (Br. in Supp. of Mot. to Dismiss at 26-28) [Dkt. 34].

participation in *The Shift* and the involvement of the detectives' supervisors, Mr. Hart would never have been arrested, and would not have spent a single day in jail.

Mr. Hart's arrest and incarceration was the direct result of the detectives' participation in *The Shift*. Christine Mannina, the lead detective in Carlton Hart's case, was the initial "focus" of the program.  At some point, the detectives who arrested and imprisoned Mr. Hart, and at least one of their supervisors, also entered into individual contracts with the production company. Under these contracts, the detectives and supervisor were paid substantial sums, and were promised future payments for so long as *The Shift* continued to film new episodes. This participation in *The Shift* caused the detectives to manipulate a photo lineup to secure a false identification of Mr. Hart, to pressure witnesses to provide testimony adverse to Mr. Hart, and to suppress exculpatory evidence that would have allowed Mr. Hart to secure an earlier release.

Even without their involvement in *The Shift*, the detectives' and supervisors' implementation of the inadequate IMPD policies and practices violated Mr. Hart's constitutional rights as follows: (1) by securing a warrant for Mr. Hart's arrest through material misrepresentations and omissions in a probable cause affidavit, and eyewitness identifications obtained through faulty lineup procedures; (2) by falsely arresting and imprisoning Mr. Hart on the basis of that arrest warrant; (3) by maliciously prosecuting Mr. Hart and/or abusing criminal process by suppressing exculpatory evidence and pressuring witnesses to provide incriminating testimony; (4) by denying Mr. Hart a speedy trial through that evidentiary misconduct; and (5) by causing the Marion County Courts to deny Mr. Hart bail through continuing material misrepresentations and omissions. These constitutional infringements each stem from Defendants' egregious violations of recommended police practices, as identified by Dr. William T. Gaut, a national police practices expert whose Declaration is attached.

In their Motion for Judgment on the Pleadings, Defendants ask this Court to ignore these circumstances and to dispose of Mr. Hart's claims against the city and its supervisory police officers without a chance for Mr. Hart to explore the depth of their involvement in his constitutional deprivations.[2] Because Mr. Hart's Amended Complaint satisfies the notice pleading requirements of the Federal Rules of Civil Procedure, and because the Motion will not end this litigation,[3] the Court should deny Defendants' Motion for Judgment on the Pleadings in its entirety and permit all of Mr. Hart's claims to proceed.

## II. Background

On November 3, 2008, three men invaded a home on the northwest side of Indianapolis ("Bluffwood Residence"), and shot brothers Richard and Duane Miller. (Am. Compl. ¶¶ 27, 28) [Dkt. 37]. While Duane survived the shootings, his brother Richard died from his injuries that night. *Id*. ¶ 28. Shortly after the shootings occurred, four homicide detectives from the Indianapolis Metropolitan Police Department ("IMPD"), Defendants Christine Mannina, Lesia Moore, Jeff Breedlove, and Tom Tudor (collectively "Defendant Detectives"), were dispatched to investigate. *Id*. ¶ 29.

During the investigation that night, Defendant Detectives obtained and viewed surveillance videos of the Bluffwood Residence and interviewed each of the four eyewitnesses-- Ricky Blueitt, Kourtney Glasscock, Tamela Daniels, and Duane Miller. *Id*. ¶ 32. Each of the

---

[2] Counsel for Defendants has also accused Mr. Hart of making allegations with recklessness as to their truth or falsity, (Br. in Supp. of Mot. for J. on the Pleadings at 2 n. 1), and requested that Mr. Hart withdraw many of his claims or risk Rule 11 sanctions. Defendants' counsel served Mr. Hart with a letter purporting to detail the deficiencies in Mr. Hart's Amended Complaint, but the letter included little more than conclusory allegations, much like Defendants' Motion, that Mr. Hart lacks the bases for some of the allegations in his Amended Complaint. Mr. Hart has responded to Defendants' letter separately but concurrently with this Response, directing Defendants' counsel to this Response, as well as the expert opinion of Dr. William T. Gaut, both of which are more than sufficient to defeat any allegations that Rule 11 has been violated in this matter.

[3] Defendants have not moved for judgment on the pleadings as to all claims.  Even if this Motion is resolved in their favor, the Defendant Supervisors and the Municipal Defendants will still be involved in discovery, and the Court will still be required to adjudicate most of the same facts.

eyewitnesses informed the police that they were unable to clearly see, or otherwise did not get a

good look at, the face of the shooter later alleged to be Mr. Hart. *Id*. ¶ 33. As a result of their

initial investigation, Defendant Detectives believed that Mr. Blueitt was involved in the

shootings, a belief that was shared by the surviving victim, Duane Miller. *Id*. ¶ 34

During this investigation, Defendant Detectives were being filmed for *The Shift*, a reality

television show produced by Lucky Shift, Inc., Discovery Communications, LLC, and/or

Discovery Communications, Inc. (collectively "Discovery"). *Id*. ¶ 30. The purpose of the show

was to highlight the work of Defendant Detectives, who were billed as "an all star squad of

homicide detectives" with "high solve and conviction rates." *Id*. ¶ 31. One of the Defendant

Detectives' supervisors, William Benjamin, was IMPD's "authorized representative" for

purposes of the show and signed the production contract.  (Ex. A, Attachment #4.)[4] In 2009, each

of the Defendant Detectives, and at least one of their supervisors, Defendant Kevin Kelly (Kelly

and Benjamin are collectively referred to as "Defendant Supervisors"), was paid by Discovery to

appear on *The Shift*, pursuant to yearly renewable contracts that guaranteed annual increases if

the show continued. (Ex. A, Attachment #4.)[5] Each individual was required by the City of

Indianapolis, the Indianapolis Department of Public Safety, the IMPD Chief of Police, the

Director of Public Safety, and/or the Mayor of Indianapolis (collectively "Municipal

Defendants") to enter into these individual contracts by the terms of the Municipal Defendants'

own contract with Discovery. *Id.* Because of *The Shift* and the involvement of the Municipal

---

[4] A copy of the July 17, 2008 Access and Location Release between the Indianapolis Police Department and Lucky Shift, Inc. and Discovery Communications, LLC is included as an attachment to the Declaration of William Gaut at Attachment #4. Dr. Gaut's Declaration is attached hereto as Exhibit A.

[5] The 2009 Participant Agreement and Appearance Releases of Lesia Moore, Tom Tudor, Jeff Breedlove, Christine Minka, and Kevin Kelly and the 2009 Location and Access Agreement Between Lucky Shift, Inc. and Indianapolis Department of Public Safety are included as an attachment to the Declaration of William Gaut at Attachment #4.

Defendants, Defendant Detectives were under pressure to obtain arrests and convictions in connection with each televised investigation. (Am. Compl. ¶ 31) [Dkt. 37].

In the weeks following the shooting, Mr. Hart and Samuel Swavely, then a minor, were alleged to be two of the men involved in the shootings at the Bluffwood Residence. One of Mr. Blueitt's friends, who was not a witness to the shootings, allegedly identified Mr. Swavely as the man who shot and killed Richard Miller; this identification was made on the basis of a comparison of surveillance footage stills with images posted on Mr. Swavely's MySpace webpage. *Id.* ¶ 35, 36. After viewing a music video montage of Indianapolis residents on Mr. Swavely's MySpace webpage, Duane Miller alleged that Mr. Hart, who briefly appeared in that music video, was the person who shot him. *Id.* ¶ 38.

Shortly thereafter, Defendant Detectives presented the four witnesses to the Bluffwood Residence shootings with a photo-lineup including a photo of Mr. Hart. *Id.* ¶ 39. While the witnesses previously informed the police they were not able to see the faces of the shooters at the Bluffwood Residence, each one identified Mr. Hart. *Id.* The witnesses were able to identify Mr. Hart in the lineup because they had been coached by the Defendant Detectives, or because Defendant Detectives deliberately failed to adhere to proper protocols, such as taking reasonable steps to prevent the witnesses from communicating about Mr. Hart's image on Mr. Swavely's MySpace webpage. *Id.* ¶¶ 39-43. *See* (Ex. A. at 15, 17.) Defendant Supervisors knew Defendant Detectives were conducting an improper photo lineup, but took no steps to prevent or correct it. (Am. Compl. ¶ 44) [Dkt. 37]; (Ex. A at 15.)

Solely on the basis of identifications produced from this faulty photo lineup, Defendant Detectives applied for, and received, a warrant for Mr. Hart's arrest on or about December 2, 2008. (Am. Compl. ¶¶ 45-47, 50) [Dkt. 37]. When Defendant Detectives applied for this warrant, however, they did not disclose the defects in their lineup, nor did they disclose the total lack of

any evidence corroborating that identification. *Id.* ¶ 47. *See* (Ex. A at 18.) Defendant Supervisors knew that Defendant Detectives were submitting a faulty probable cause affidavit, but took no steps to stop them. (Am. Compl. ¶ 49) [Dkt. 37]; (Ex. A at 15.)

Mr. Hart maintained his innocence upon arrest, and presented Defendant Detectives with a verifiable alibi. *Id.* ¶ 51. Defendant Detectives failed to investigate Mr. Hart's alibi because it did not support their theory of his guilt. *Id.* ¶ 52.  In addition, verifying the alibi would have meant that the case was not solved, thus affecting the "high solve" rate being promoted by *The Shift*. *Id.* ¶ 31; (Ex. A at 7.)  Further, this television episode aired on January 25, 2009, less than two months after Mr. Hart's arrest, and could not have moved forward if the case were unsolved.[6]

During the course of their investigation, Defendant Detectives acquired substantial evidence tending to exculpate Mr. Hart, such as phone records, computer records, and testimony that Mr. Hart was at his music studio during the shootings at the Bluffwood Residence; and analyses of DNA taken from bullet shells found at the Bluffwood Residence that did not match Mr. Hart's DNA. *Id.* Defendants attempted to prevent this exculpatory evidence from becoming available to Mr. Hart's defense attorney or to the prosecution. *Id. See also* (Ex. A at 20, Attachment #5.) Defendant Detectives also attempted to manufacture incriminating evidence against Mr. Hart, such as coaching Adrian Rocket to state that he sold a gun to Mr. Hart matching the type used in the shootings at the Bluffwood Residence. (Am. Compl. ¶ 54) [Dkt. 37]; (Ex. A at 14-15.) Defendant Supervisors were made aware of Defendant Detectives' investigatory tactics, and took no steps to prevent or step them. (Am. Compl. ¶ 56) [Dkt. 37]; (Ex. A at 14, 18, 21-23.)

---

[6]IMDb, The Shift – Season 1, Episode 6 ("Brother's Keeper") http://www.imdb.com/title/tt1425586/.

In late 2009, when Mr. Blueitt informed Defendant Detectives that he was unsure of his identifications of Mr. Hart and Mr. Swavely, they pressured him to maintain those identifications and failed to inform the prosecutor's office of Blueitt's doubts. (Am. Compl. ¶ 57) [Dkt. 37]. In December 2009, Mr. Blueitt gave a taped statement to the IMPD regarding his concerns, and he testified that he was pressured to maintain his identifications. *Id*. ¶ 58. On or about December 14, 2009, Mr. Blueitt made the same statements in open court. *Id*. Although Mr. Swavely was released that day, Defendant Detectives continued to press for Mr. Hart's continued prosecution with the knowledge and acquiescence of Defendant Supervisors. *Id*.

Over the course of the next year, Defendant Detectives identified no evidence supporting their theory that Mr. Hart was involved in the shootings at the Bluffwood Residence while exculpatory evidence continued to surface. *Id*. ¶¶ 59-61. For example, one of the witnesses, Kourtney Glasscock, was unable to repeat her identification of Mr. Hart when she was deposed in May 2010. *Id*. ¶ 59. At the same time, no evidence ever surfaced connecting Mr. Hart to the shootings or to Mr. Swavely. *Id*. ¶ 61. Defendant Detectives still continued to press for Mr. Hart's continued prosecution and incarceration, and continued to resist producing discovery that would have allowed Mr. Hart to secure an earlier dismissal of the charges against him. *Id*. ¶¶ 62, 63. Those charges were ultimately dismissed on October 20, 2010 for an "insufficient nexus between defendant and crime." *Id*. ¶ 65.

### III. <u>Legal Standard</u>

Defendant's Motion for Judgment on the Pleadings is adjudged by the same standard as a Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). To survive a motion for judgment on the pleadings, a complaint need only contain "a short and plain statement of the claim showing the pleader is entitled to relief, and there is no need for detailed factual allegations." *Dailey v.*

*McKinney*, No. 1:10-cv-1121, Entry on Mot. to Dismiss at 1 (S.D. Ind., Feb. 24, 2011) (J.

Lawrence). Moreover, "the Court must take the facts alleged in the complaint as true and draw

all reasonable inferences in favor of Plaintiffs." *Id.* The Complaint need only provide enough

information to "give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests," and to "raise a right to relief above the speculative level." *Id.* (quoting *Pisciotta

v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007))).

## IV. Legal Argument

### A.  Mr. Hart Properly Pleaded *Monell* Claims Against the City of Indianapolis, the Department of Public Safety, and the Individuals Sued in Their Official Capacities.

When Mr. Hart was wrongfully arrested in December 2008 and wrongfully imprisoned

for the next two years, the deprivations of his constitutional rights were not the result of rogue

public servants. Rather, the individuals directly responsible for these violations were enabled in

their misconduct by the policies, practices, and/or the decisions of the final decision-makers of

Defendant City of Indianapolis and its departments. *See McTigue v. Chicago*, 60 F.3d 381, 382

(7th Cir. 1995) (describing these three categories as bases for municipal liability under 42 U.S.C.

§ 1983). Although Defendants argue that Mr. Hart failed to "factually allege the existence of an

actual unconstitutional custom, policy or practice maintained by the City," (Mot. for J. on the

Pleadings ¶ 6.A) [Dkt. 49], Mr. Hart properly pleaded his *Monell* claims against the Municipal

Defendants. The Court should reject Defendants' overstated pleading requirements, and deny

their request for judgment on Mr. Hart's *Monell* claims.

   1.  Mr. Hart's Allegations of an Unconstitutional Policy or Decision Satisfy the Requirements of *Iqbal* and *Twombly*.

The Court should reject Defendants' first argument, that Mr. Hart failed to plead

sufficient factual allegations of an unconstitutional policy or policymaker decision to satisfy the

8

Supreme Court's plausibility standard announced in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949

(2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Defendants' *Iqbal* argument ignores

the substantial detail provided in Mr. Hart's Amended Complaint, and also ignores the Seventh

Circuit's decidedly measured approach to *Iqbal* and *Twombly*'s plausibility standard.

   In *Twombly*, the Supreme Court established that a federal antitrust plaintiff's claims must

be sufficiently factually detailed "to raise a [plaintiff's] right to relief above the speculative

level." 550 U.S. at 555-56. Two years later, in *Iqbal*, the Court held that this standard applied to

the broader universe of federal civil claims, but did little to clarify how much detail is necessary

to render a claim "plausible." 129 S.Ct. at 1949 (holding that "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Shortly after *Iqbal*, the Seventh Circuit Court of Appeals addressed the plausibility standard,

holding that "specific facts are not necessary," and that the Complaint "need only give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Swanson v.

Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). A claim satisfies this requirement if "the

plaintiff [ ] give[s] enough details about the subject-matter of the case to present a story that

holds together," and that "distinguish[es] the particular case that is before the court from every

other hypothetically possible case in that field of law." *Id*. at 405.

   In his Amended Complaint, Mr. Hart provided more than enough detail to give

Defendants "fair notice of the nature and basis or grounds of [his] claim[s]." *Id*. at 404 (quoting 5

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1215 at 165-73 (3rd Ed.

2004)). When the Defendant Detectives investigated Mr. Hart for his alleged involvement in the

shootings at the Bluffwood Residence, they were serving two masters – the Municipal

Defendants and Discovery. (Am. Compl. ¶ 29-31) [Dkt. 37]; (Ex.A, Attachment #4.) Faced with

the need to solve that case for an hour-long television program, Defendant Detectives selectively

9

disclosed information to the Indiana courts to obtain an arrest warrant, and worked to keep Mr. Hart imprisoned for the next two years in the face of a total lack of incriminating evidence and substantial exculpatory evidence. *See* (Am. Compl. ¶ 64) [Dkt. 37]. *Accord* (Ex. A at 23) ("The result . . . encourages detectives to violate generally accepted investigative standards, even to the point of arresting and charging innocent persons such as Carlton Hart.")

Mr. Hart's arrest and imprisonment could or would not have occurred without the specific authorization and direction of the Municipal Defendants that the Defendant Detectives participate in *The Shift*. *See* (Ex. A at 21-23.) Municipal Defendants chose to allow the IMPD's homicide department to be sensationalized on national television for its "high solve and conviction rates," knowing that at least some of its detectives were disregarding constitutional limitations and ordinary police procedures for this purpose. (Am. Compl. ¶ 64, 68-70, 74) [Dkt. 37]; (Ex. A. at 23.)

Since filing his Amended Complaint, Mr. Hart has obtained additional information about the Municipal Defendants' role in his constitutional deprivations. Defendant Detectives didn't just sacrifice Mr. Hart for better Nielsen ratings and a higher profile; they were paid actors under contract to Discovery. (Ex. A, Attachment #4.) But it wasn't just Defendant Detectives being paid by a private company for their police work – at least one of the Defendant Supervisors, Kevin Kelly, was also being paid. *Id.* Further, the Defendant Detectives' other supervisor, William Benjamin, was the police department's "authorized representative" for the July 17, 2008 contract, and he signed the production contract. *Id.* Worst of all, at least by 2009 the Municipal Defendants *required* the Defendant Detectives to enter into contracts with Discovery as part of the Municipal Defendants' own contract with Discovery. *Id.* at 22, Attachment #4 ("Of concern is the fact that [the Director of Public Safety] approved the gratuities, and even compelled the detectives to participate.").

Municipal Defendants' custom, policy, and/or decision that Defendant Detectives present their police work as televised entertainment was the "moving force" behind Mr. Hart's constitutional violations. *Grieveson v. Anserson*, 538 F.3d 763, 771 (7th Cir. 2008). *See* (Ex. A at 23) ("The approval of these detectives' participation in *The Shift* by the highest levels of command within the police department, along with the notoriety of television exposure, all constituted policies and practices of IMPD that resulted in the violation of Carlton Hart's constitutional rights.") Accordingly, the Court should deny Defendants' request for judgment on Mr. Hart's claims against the Municipal Defendants.

   2.   Mr. Hart is Not Required to Plead Multiple Violations to Establish an Unconstitutional Custom.

The Court should also reject Defendants' argument that Mr. Hart is required to plead multiple incidents of unconstitutional conduct to establish a *Monell* claim through Municipal Defendants' customs. While Mr. Hart may ultimately be required to *prove* multiple incidences to establish a custom in violation of Section 1983 or raise issues of fact on summary judgment, he is not required to *plead* them at the beginning of litigation. *Compare City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985) (holding that "*proof* of a single incident of unconstitutional activity" is generally insufficient to establish liability for a *Monell* custom) and *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) ("*Summary judgment* was proper . . . where one incident was insufficient to establish a widespread custom") with *Edwards v. City of Goldsboro*, 178 F.3d 231, 245 (4th Cir. 1999) (holding that a plaintiff "is not required under Rule 8(a)(2) to . . . plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation") *and Atchinson v. D.C.*, 73 F.3d F3d 418, 423 (D.C. Cir. 1996) ("a plaintiff need not *plead* multiple instances of misconduct") (emphases added). Because Defendants are seeking judgment on the pleadings and not summary judgment, the Court should reject Defendants' argument that Mr. Hart was required

to plead multiple incidents of constitutional misconduct to establish *Monell* liability against the Municipal Defendants.

Moreover, Defendant Detectives were responsible for multiple incidents of unconstitutional misconduct. For example, Defendant Detectives secured an arrest warrant for Mr. Swavely on the basis of a faulty identification, as they had with Mr. Hart, leading Dr. Gaut to conclude "that misconduct by IMPD detectives occurs regularly, with the knowledge and approval of police supervisors. This constitutes constructive approval of police misconduct, which serves to establish operational policy and overrides any contrary written policy, which itself was inadequate and did not meet professional standards." (Ex. A at 15.) Likewise, although both Mr. Swavely and Mr. Hart gave alibis to Defendant Detectives upon arrest, "[n]o effort was made to investigate the alibi information. . . ." *Id*. at 19. Finally, Dr. Gaut noted that Defendant Detectives "pressured multiple witnesses to identify Mr. Hart and Mr. Swavely." *Id*. at 14. The Court should, therefore, reject Defendants' argument that Mr. Hart did not plead a proper *Monell* claim on the grounds that he failed to plead multiple incidents of constitutional violations.

Accordingly, the Court should deny Defendants' request for judgment on Mr. Hart's claims against the Muncipal Defendants.

**B.  *Iqbal* Did Not Eliminate Individual Liability Under Section 1983 for Supervisors.**

Defendant Supervisors William Benjamin and Kevin Kelly knew of Defendant Detectives' violations of Mr. Hart's federal constitutional rights, and chose to turn a blind eye. While *respondeat superior* is never a basis for Section 1983 liability for governmental supervisors, Such supervisors are nonetheless required to prevent or to put a stop to their subordinates' constitutional misconduct when it is known to them. Contrary to Defendants' argument, *Ashcroft v. Iqbal* did not eliminate supervisors' liability under Section 1983 for failing to fulfill that responsibility.

12

In *Iqbal*, the plaintiff sued the U.S. Attorney General and the FBI Director for racial and religious discrimination on the grounds that those officials knew and acquiesced in their subordinates' decision to detain him solely on account of his race, religion, and/or national origin. The Supreme Court rejected this theory of liability, holding that governmental officials may only be held liable for their own misconduct. *Iqbal*, 129 S.Ct. at 1949. In doing so, the Court noted that a discrimination claim requires purposeful misconduct and, therefore, the mere knowledge of and acquiescence of the defendants in their subordinates' misconduct was insufficient to trigger liability. *Id*. In other words, the Court held that supervisors may only be held liable for the conduct of their subordinates where the supervisor acted with the same degree of intent necessary to establish a direct violation of the federal constitutional right asserted.

This interpretation of *Iqbal* has since been confirmed by multiple federal courts of appeal, including the Seventh Circuit. *See*, *e.g.*, *Starr v. Baca*, 633 F.3d 1191, 1196 (9th Cir. 2011) (gathering opinions from the First, Seventh, and Tenth Circuit Courts of Appeal). In *Starr*, the Ninth Circuit agreed that a supervisor could be held liable for the unconstitutional conditions of confinement of an arrestee where the supervisor "acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights . . . ." *Id*. In *Dodds v. Richardson*, the Tenth Circuit held that a supervisor may be liable under Section 1983 if he acted or failed to act with "the same state of mind required for the constitutional deprivation [ ] allege[d]." 614 F.3d 1185, 1204 (10th Cir. 2010). And in *Sanchez v. Pereira-Castillo*, the First Circuit held that "supervisory officials may be liable on the basis of their own acts or omissions," including supervising "with deliberate indifference toward the possibility that deficient performance of the task may contribute to a civil rights deprivation." 590 F.3d 31, 49 (1st Cir. 2009).

The Seventh Circuit affirmed this approach in at least two post-*Iqbal* cases. In *T.E. v. Grindle*, the court held that *Iqbal* does not change the fact that "[w]hen a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution, regardless of whether the actor is a supervisor or subordinate, and the actor may be held liable for the resulting harm." 599 F.3d 583, 591 (7th Cir. 2010). Similarly, in *Trentadue v. Redmon*, the court held that supervisors may still be held individually liable for the constitutional misconduct of their subordinates where they "knew about [subordinates'] misconduct and facilitated, approved, condoned, or turned a blind eye to it." 619 F.3d 648, 652 (7th Cir. 2010). And this District Court even more recently held that "supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent." *M.T. v. Union County College Corner Joint Sch. Dist.*, No. 1:09-cv-1383, 2011 WL 837011 at *4 (S.D. Ind, Mar. 3, 2011) (J. Barker) (quoting *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005)).

Accordingly, Mr. Hart's individual-capacity claims against Defendant Supervisors are properly pled because he alleged they knew of and acquiesced in his constitutional violations. They knew and acquiesced when their subordinates coached witnesses and manipulated the photo array to secure a false identification of Mr. Hart. (Am. Compl. ¶ 44) [Dkt. 37]; (Ex. A at 15.) They knew and acquiesced when their subordinates knowingly submitted a faulty probable cause affidavit to secure a warrant for Mr. Hart's arrest. (Am. Compl. ¶ 49) [Dkt. 37]; (Ex. A at 15.) And they worked with their subordinates to suppress exculpatory evidence and to resist providing discovery, which caused Mr. Hart to be wrongfully imprisoned for nearly two years. *Id.* ¶ 64.

The Court should, therefore, deny Defendants' request for judgment on Counts I – VI of the Amended Complaint on the grounds that Mr. Hart failed to state a claim upon which relief may be granted against Defendant Supervisors.

## C. Defendant Supervisors Are Not Entitled to Qualified Immunity.

While Defendant Supervisors enjoy qualified immunity from suit for their official conduct, their misconduct with regards to Mr. Hart strips that protection from them. Under the doctrine of qualified immunity, public officials are immune from suit unless (1) the alleged facts, taken in a light most favorable to the plaintiff, show that the officers violated a constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *See also Pearson v. Callahan*, 129 S.Ct. 808, 821-22 (2009) (holding that trial courts may determine which *Saucier* element to evaluate first). Because each of Mr. Hart's claims against Defendant Supervisors stem from violations of well-established constitutional rights, and because Mr. Hart pleaded sufficient details to establish Defendant Supervisors' liability for violating those rights, the Court should deny Defendants' request for judgment on the grounds of qualified immunity.

1. Count I: Making False or Misleading Statements in Support of a Probable Cause Affidavit

Qualified immunity does not protect governmental officials from individual Section 1983 liability for the submission of a false or misleading probable cause affidavit where "a reasonably well-trained officer in [the official's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 336 (1986). *See also Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011). In the Seventh Circuit, it has also been recognized that officials may be held liable for "the intentional or reckless omission of material facts" in a probable cause affidavit. *Olson v. Tyler*, 771 F.2d

277, 281 n.5 (7th Cir. 1985); *Wilkerson v. Wright*, No. 09-cv-1314, 2011 WL 847074 at *4 (S.D. Ind., Mar. 9, 2011) (J. Lawrence) (citing *Olson* for the same proposition).

Defendant Detectives obtained a warrant for Mr. Hart's arrest solely on the basis of a probable cause affidavit designed to mislead the Indiana courts through the omission of material information. The only grounds for probable cause offered by Defendant Detectives in their affidavit were the four eyewitness identifications obtained through Defendant Detectives' faulty photo lineup. *See* (Am. Compl. ¶ 50) [Dkt. 37].[7] Defendant Detectives coached the witnesses to identify Mr. Hart and/or otherwise deliberately failed to follow proper protocols, all for the purpose of securing a false identification. *Id*. ¶¶ 39-42. *See* (Ex. A at 13-15.) Defendant Detectives manipulated the lineup because the witnesses had previously admitted they were unable to see the faces of the shooters at the Bluffwood Residence. (Am. Compl. ¶¶ 39-42) [Dkt. 37]; (Ex. A at 16-18.)  Defendant Detectives did not inform the magistrate of this manipulation, nor did they inform the magistrate of the witnesses' prior inconsistent statements. (Am. Compl. ¶ 47 [Dkt. 37]; (Ex. A at 17.) Defendants also failed to note the absence of any other evidence that would tend to corroborate the identifications. *See* (Am. Compl. ¶ 47);  Defendant Supervisors knew about Defendant Detectives' misleading probable cause affidavit, and "facilitated, approved, condoned, or turned a blind eye to it." *Trentadue*, 619 F.3d at 652; (Am. Compl. ¶ 44, 49) [Dkt. 37]; (Ex. at 15.)

Accordingly, the Court should deny Defendants' request for judgment on Count I of the Amended Complaint on grounds of qualified immunity.

---

[7] The New Jersey Supreme Court recently opined on this subject in *New Jersey v. Henderson*. --- A.3d ---, 2011 WL 3715028 (N.J. 2011). In *Henderson*, the court identified the inherent unreliability of eyewitness identifications and difficulty in identifying and rectifying such mistakes; and adopted the IACP standard discussed in Dr. Gaut's affidavit as the minimum safeguard against mistaken eyewitness identifications. *See generally Henderson*, 2011 WL 3715028. *See also* (Ex. A at 10-16).

2.  Count II: False Arrest / False Imprisonment

False arrest and false imprisonment are both also clearly established federal constitutional torts. *E.g.*, *Wallace v. Kato*, 549 U.S. 384 (2007). A governmental official may be held liable under Section 1983 for false arrest and/or false imprisonment where he seizes a person without probable cause. *E.g.*, *Brooks v. City of Chicago*, 564 F.3d 830, 832 (7th Cir. 2009) (quoting *Sneed v. Rybicki*, 146 F.3d 478, 481 (7th Cir. 1998)); *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009). While "[a]n arrest . . . pursuant to a valid warrant is presumptively constitutional," that presumption does not apply where "the officer seeking the warrant intentionally or recklessly misstated or omitted material facts to obtain the warrant, and there would not have been probable cause had the testimony been accurate." *Gatzimos v. Garrett*, 2011 WL 2989732 at *3 (7th Cir., July 22, 2011) (citing *Franks v. Delaware,* 438 U.S. 154,171–72 (1978)).

Defendant Detectives arrested Mr. Hart solely pursuant to a warrant obtained by virtue of Defendant Detectives' faulty probable cause affidavit, described in section C.1, *supra*. (Am. Compl. ¶ 50) [Dkt. 37]. They arrested him despite having knowledge that no probable cause existed for his arrest – knowing that the witnesses who identified him as a suspect lacked the ability to identify the shooters at the Bluffwood Residence. *Id.* ¶ 33, 48; (Ex. A at 16-18.) Defendant Supervisors knew that Defendant Detectives were making an arrest without probable cause, and "facilitated, approved, condoned, or turned a blind eye to it." *Trentadue*, 619 F.3d at 652; (Am. Compl. ¶ 49) [Dkt. 37].

Accordingly, the Court should deny Defendants' request for judgment on Count II of the Amended Complaint on grounds of qualified immunity.

3.  Counts III & IV: Malicious Prosecution & Abuse of Process

Because Defendants challenge the existence of Section 1983 claims analogous to malicious prosecution and abuse of process in the Seventh Circuit, the establishment of such claims are discussed in greater detail below. *See* Section E, *infra*. Contrary to Defendants' argument, however, the Seventh Circuit Court of Appeals has recognized Section 1983 as a proper vehicle to pursue those claims in states, such as Indiana, that provide no remedy under state law. *See Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) (discussing Section 1983 malicious prosecution claims); *Adams v. Rotkovich*, 325 Fed. Appx. 450, 453 (7th Cir. 2009) (discussing Section 1983 abuse of process claims); Ind. Code § 34-13-3-3(8) (providing police officers immunity from state law malicious prosecution and abuse of process claims).

Defendant Detectives caused the Marion County Prosecutor's office to institute and maintain a criminal prosecution against Mr. Hart knowing there was no probable cause to do so. Defendant Detectives suppressed exculpatory evidence, manufactured incriminating evidence, and pressured witnesses to identify Mr. Hart in connection with the shootings at the Bluffwood Residence. *E.g.*, (Am. Compl. ¶¶ 54, 55, 57, 58) [Dkt. 37]; (Ex. A at 14, 18.) They did so in bad faith, with the hopes that Mr. Hart would simply accept a plea bargain if he were incarcerated long enough. *Id.* ¶ 55. Defendant Supervisors knew that Defendant Detectives were manipulating and abusing the prosecution against Mr. Hart, and "facilitated, approved, condoned, or turned a blind eye to it." *Trentadue*, 619 F.3d at 652; (Am. Compl. ¶¶ 56, 64) [Dkt. 37]; (Ex. A at 18.)

Accordingly, the Court should deny Defendants' request for judgment on Counts II and III of the Amended Complaint on grounds of qualified immunity.

4.  Count V: Denial of a Speedy Trial

The right to a speedy and public trial is a specifically enumerated constitutional right. U.S. Const. amend. VI; (Br. in Supp. of Mot. for J. on the Pleadings at 13) ("[i]n all criminal

prosecutions, the accused shall enjoy the right to a speedy . . . trial.") (quoting *Vermont v. Brillon*, 129 S.Ct. 1283, 1290 (2009)).

As noted above, and as discussed in greater detail in Section D, *infra*, Defendant Detectives suppressed exculpatory evidence, manufactured incriminating evidence, and pressured witnesses to identify Mr. Hart in connection with the shootings at the Bluffwood Residence. (Am. Compl. ¶¶ 55, 57, 58) [Dkt. 37]; (Ex. A at 13-18.) These manipulations by Defendant Detectives were undertaken for the purpose of prolonging Mr. Hart's prosecution with the hopes he would eventually accept a plea bargain. (Am. Compl. ¶ 55) [Dkt. 37]. As a result, Mr. Hart was incarcerated for nearly two years while awaiting trial for crimes he did not commit. Defendant Supervisors knew that Defendant Detectives were causing delays in Mr. Hart's prosecution in bad faith, and "facilitated, approved, condoned, or turned a blind eye to it." *Trentadue*, 619 F.3d at 652; (Am. Compl. ¶¶ 56, 64) [Dkt. 37].

Accordingly, the Court should deny Defendants' request for judgment on Count V of the Amended Complaint on grounds of qualified immunity.

5. Count VI: Making False or Misleading Statements in Support of Opposition to Bail

Just as it is a well-established constitutional violation for governmental officials to make false or misleading statements to secure an arrest warrant, it is constitutional misconduct to do so in opposition to a criminal defendant's application for bail. *See Bretz v. Kelman*, 773 F.2d 1026 (9th Cir. 1985). Defendant Detectives maintained the same materially misleading statements to prevent Mr. Hart from obtaining bail that they made to secure an arrest warrant. *See* (Am. Compl. ¶ 47) [Dkt 37]. Defendant Supervisors knew that Defendant Detectives were continuing in their deception, and "facilitated, approved, condoned, or turned a blind eye to it." *Trentadue*, 619 F.3d at 652; *See id.* ¶ 44, 49.

Each of Counts I-VI against Defendant Supervisors stem from violations of well-established constitutional rights.  Mr. Hart has pleaded sufficient facts to establish Defendant Supervisors' liability for violating Mr. Hart's constitutional rights.  Thus, the Court should deny Defendants' request for judgment on Counts I-VI on grounds of qualified immunity.

**D.  The Individual Defendants Violated Mr. Hart's Speedy Trial Rights.**

Pursuant to the Sixth Amendment to the U.S. Constitution, Mr. Hart was entitled to "a speedy and public trial" after being arrested in December 2008 for his alleged role in the home invasion and shootings at the Bluffwood Residence. Rather than cooperate with the prosecutors and defense counsel to ensure the criminal proceedings against Mr. Hart were resolved in a timely manner, however, the Defendant Detectives engaged in a campaign of delay with the knowledge and acquiescence of Defendant Supervisors (collectively "Individual Defendants"). Because the Individual Defendants prevented Mr. Hart from securing a dismissal of the charges against him for nearly two years, during which time he remained imprisoned in the Marion County jail, the Court should deny Defendants' request for judgment on Count VI of his Amended Complaint.

Claims for violations of the Sixth Amendment are adjudged under a multi-factor balancing test. *See United States v. Loera*, 565 F.3d 406, 412 (7th Cir. 2009). The Court must ultimately weigh (1) the length of delay before trial; (2) the comparative responsibility of the State and the criminal defendant for the delay; (3) whether the criminal defendant asserted his speedy trial rights; and (4) the prejudice caused to the criminal defendant by the delay." *Id*. At the pleadings stage, however, Mr. Hart need only establish (1) that he suffered a prejudicial delay, and (2) that he was not wholly responsible for that delay. *See Blake v. Katter*, 693 F.2d 677, 681-82 (7th Cir. 1982) (reversing the dismissal of a Section 1983 speedy trial claim where plaintiff was incarcerated for seven months, and was not wholly responsible for the delay). *See*

*also Dickey v. Florida*, 398 U.S. 30, 56 (1970) (J. Harlan, concurring) (a prima facie violation of the Speedy Trial Clause is established by showing that "prosecution was delayed beyond the point at which a probability of prejudice arose and that he [criminal defendant] was not responsible for the delay.")

The Court should assume for purposes of the Motion that the length of the delay was prejudicial because Defendants make no argument to the contrary. To the extent the Court independently considers this element, however, Mr. Hart is entitled to a presumption that the delay was prejudicial because the charges against him were pending for nearly two years. *United States v. Leora*, 565 F.3d 406, 412 (7th Cir. 2009) (holding a delay approaching one year to be presumptively prejudicial). Moreover, the delay was actually prejudicial because Mr. Hart spent that entire period incarcerated, cut off from his personal and professional relationships, his income, and the other incidents of a normal life.

More important for the purposes of the Motion, Mr. Hart pleaded sufficient facts to establish that he was not wholly responsible for this delay. Instead, the delay was caused solely or principally by the Individuals Defendants' misconduct, including their intransigence during the discovery process. Specifically, Defendant Detectives suppressed exculpatory evidence including, but not limited to, phone records showing Mr. Hart to be at his recording studio while the shootings occurred; statements from witnesses that Mr. Hart was at his music studio while the shootings occurred; files from Mr. Hart's computer showing that he was at his music studio while the shootings occurred; and analyses of DNA taken from bullet shells found at the Bluffwood Residence that did not match Mr. Hart's DNA. (Am. Compl. § 52) [Dkt. 37]. In addition, while the prosecution was ongoing, Defendant Detectives attempted to manufacture incriminating evidence - coaching an individual named Adrian Rocket to falsely claim, among other things, that he had earlier sold a gun, matching the type used at the Bluffwood Residence,

to Mr. Hart. *Id*. ¶ 54; (Ex. A at 14-15.) Likewise, Defendant Detectives pressured at least one of the witnesses to identify Mr. Hart as one of the shooters at the Bluffwood Residence. (Am. Compl. ¶ 57) [Dkt. 376]; (Ex. A at 14.) Defendant Supervisors knew about this misconduct, but took no steps to prevent or correct it. (Am. Compl. ¶ 56) [Dkt. 37]; (Ex. A at 15.) Since filing his Amended Complaint, Mr. Hart also learned that even the Marion County Prosecutor's Office complained on multiple occasions that the police were not providing them with relevant evidence in a timely manner. (Ex. A, at 20, Attachment #5.)[8]

Defendants also argue that the Court should grant judgment on this claim because the CCS shows Mr. Hart's attorney requested some continuances and/or enlargements of time. *See* (Br. in Supp. of Mot. for J. on the Pleadings at 12.) At this stage, however, the CCS is insufficient to establish that Mr. Hart was responsible for the delays in his prosecution. *See Blake*, 693 F.2d at 681 (rejecting arguments that notations on a docket sheet established a waiver of plaintiff's Sixth Amendment rights). The CCS contains absolutely no information why Mr. Hart made these requests, only that they were made. In addition, at least some of the requests are connected to Defendants' misconduct. For example, the CCS shows a Joint Motion for Continuance on December 14, 2009, when one of the witnesses to the Bluffwood Residence shootings testified in open court that Det. Mannina pressured him not to admit he was unsure about his identification of the shooters. (Mot. for J. on the Pleadings, Ex. A) [Dkt. 51]; (Am. Compl. ¶ 58) [Dkt. 37]. The Court should, therefore, reject the CCS as a basis to conclude that Mr. Hart was responsible for the delays in his prosecution.

Accordingly, the Court should deny Defendants' request for judgment on the pleadings as to Count VI of the Amended Complaint.

---

[8] A copy of e-mails Between Deputy Prosecutor Noah Schafer and Jeff Breedlove (June 18, 2010) is attached to Dr. Gaut's Declaration as Attachment #5.

**E.  The Seventh Circuit Permits Section 1983 Malicious Prosecution / Abuse of Process Claims Where They Are Unavailable Under State Law.**

Despite knowing that there was no probable cause to prosecute Mr. Hart for his alleged involvement in the Bluffwood Residence shootings, based on the absence of incriminating evidence and the presence of exculpatory evidence, Defendants nonetheless caused the Marion County Prosecutor's Office to institute and maintain a criminal complaint against Mr. Hart. Because Mr. Hart has no remedy for Defendant's misconduct under Indiana state law, he has properly brought malicious prosecution and abuse of process claims pursuant to Section 1983. As Counts III and IV of the Amended Complaint represent distinct and separate wrongs and injuries to Mr. Hart, the Court should deny Defendants' request for judgment and permit those claims to proceed.

In *Albright v. Oliver*, a divided Supreme Court held that substantive due process does not give rise to a constitutional tort for malicious prosecution. 510 U.S. 266, 275 (1994). The plurality left open, however, the possibility that such a claim could "succeed under the Fourth Amendment." *Id*. Justices Kennedy and Thomas concurred, assuming without deciding that "some of the interests granted historical protection by the common law of torts (such as the interests in freedom from defamation and malicious prosecution) are protected by the Due Process Clause." *Id*. at 283-84. However, the justices also explained that because state common law typically sufficed to protect these procedural due process interests, Section 1983 is not an appropriate vehicle "so long as the State provides an adequate postdeprivation remedy." *Id*. at 284 (citing *Parratt v. Taylor*, 451 U.S. 527, 535-44 (1981)).

The Seventh Circuit expressly adopted Justice Kennedy's view in *Newsome v. McCabe*, holding that Section 1983 claims for malicious prosecution are permissible where state law "withholds a remedy." 256 F.3d 747, 751 (7th Cir. 2001). The Seventh Circuit has consistently maintained this view, see *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011), and has also

adopted this approach with regards to Section 1983 abuse of process claims. *Adams v. Rotkovich*, 325 Fed. Appx. 450, 452-53 (7th Cir. 2009). Indiana, meanwhile, has granted its officials immunity from state law malicious prosecution and abuse of process claims, eliminating any state law remedy for those violations. *Ind. Code* § 34-13-3-3(6). Because Indiana has withheld remedies for malicious prosecution and abuse of process, Mr. Hart should be permitted to pursue those claims under Section 1983.

Despite Mr. Hart's lack of an Indiana state law remedy for malicious prosecution or abuse of process, however, Defendants argue he still may not bring these claims under Section 1983. Defendants offer no rationale for their request that the Court depart from *Newsome*, nor do they offer any appellate support for their position. Instead, Defendants rely solely on a single summary judgment order issued by this Court in 2008. *See Bishop v. City of Indianapolis*, No. 1:06-cv-1064-SEB-TAB, 2008 WL 820188 (S.D. Ind., Mar. 24, 2008). In *Bishop*, the Court rejected an Indiana plaintiff's Section 1983 malicious prosecution claim, even though he was barred from bringing a state law malicious prosecution claim, on the grounds that the plaintiff could have (and did) bring other state and federal claims for related wrongs. *Id.* at 31.

This Court should reject *Bishop*'s non-binding reasoning as inconsistent with the Supreme Court's teachings in *Paratt*, Justice Kennedy's *Albright* concurrence, and the Seventh Circuit's adoption of those views in *Newsome* and subsequent cases. To the extent Indiana's common law of torts applies to the actions of governmental officials, it provides a protective scheme against arbitrary exercises of power, which incidentally coincide with the interests protected by the U.S. Constitution's Due Process Clause. *See Albright*, 510 U.S. at 283. Each species of tort, however, obviously only protects against a certain type of misconduct. Accordingly, while certain constitutional interests are implicated by multiple different torts, these torts do not necessarily implicate all of the same constitutional interests.

24

The constitutional interests tied to Mr. Hart's malicious prosecution and abuse of process claims are not identical to those he seeks to vindicate through his claims for false arrest / false imprisonment (Count II) or his claim that Defendants made false and/or misleading statements to obtain an arrest warrant (Count I). Each of those claims relates to Mr. Hart's right to be free of unreasonable seizures, but Justice Kennedy recognized that malicious prosecution claims implicate constitutionally protected interests "other than the interest in freedom from physical restraint." *See Albright* at 283-84. For example, a criminal prosecution "cost[s] the accused money in legal fees." *Id*. at 283. More troubling, because Mr. Hart was charged with the crime of murder, Defendants put Mr. Hart at risk of being sentenced to death. *Ind. Code* § 35-50-2-3(b)(1)(A). The Court should, therefore, decline to follow the non-binding holding in *Bishop*, and should reject Defendants' arguments that these claims are duplicative of Mr. Hart's other constitutional claims.

Accordingly, the Court should deny Defendants request for judgment on Counts III and IV of the Amended Complaint.

### V.  Conclusion

WHEREFORE, Plaintiff Carlton Hart respectfully requests the Court deny Defendants' Motion for Judgment on the Pleadings in its entirety, and further seeks all other just and proper relief. To the extent the Court improvidently grants Defendants' Motion, in whole or in part, Mr. Hart alternatively requests that the Court dismiss his claims without prejudice to allow him the opportunity to amend and replead his claims.

Respectfully submitted,


*s/ Sandra L. Blevins*
Kevin W. Betz
Sandra L. Blevins

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on the 31st day of

August, 2011. Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system. Parties may access this filing through the Court's system.

Alexander Will, Esquire (awill@indy.gov)
OFFICE OF CORPORATION COUNSEL
200 E. Washington St., Rm. 1601
Indianapolis, IN 46204

John C. Ruckelshaus, Esquire (jcr@rucklaw.com)
John F. Kautzman, Esquire (jfk@rucklaw.com)
Andrew R. Duncan, Esquire (ard@rucklaw.com)
RUCKELSHAUS, KAUTZMAN, BLACKWELL, BEMIS & HASBROOK
107 N. Pennsylvania St., Suite 900
Indianapolis, IN 46204

*s/ Sandra L. Blevins*
Sandra L. Blevins

BETZ + BLEVINS
One Indiana Square
Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com