UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CARLTON HART, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:10-CV-1691-WTL-MJD |
| ) | |
| CHRISTINE MANNINA, *et al.,* ) | |
| ) | |
| Defendants. ) | |

### ENTRY ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

This cause is before the Court on the Defendants' motion for judgment on the pleadings (dkt. no. 49). The motion is fully briefed,[1] and the Court, being duly advised, **DENIES IN PART** and **GRANTS IN PART** the Defendants' motion for the reasons set forth below.

### I. STANDARD

In reviewing a motion for judgment on the pleadings, the Court applies the same standard as that of a motion to dismiss under Rule 12(b)(6), and therefore takes the facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff. The complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and there is no need for detailed factual allegations. However, the statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007)).

---

[1] The Plaintiff has filed a motion for leave for file a surreply (dkt. no. 76), and the Defendants filed their response, objecting. The Court **GRANTS** the Plaintiff's motion, and the Plaintiff's surreply is hereby deemed filed as of the date of this entry.

## II. BACKGROUND

In late 2008, Defendants Christine Mannina, Lesia Moore, Jeff Breedlove, and Tom Tudor (the "Detectives"), detectives with the Indianapolis Metropolitan Police Department (the "IMPD"), were being filmed for a reality television show produced by Lucky Shift, Inc., Discovery Communications, LLC, and Discovery Communications, Inc. (collectively "Discovery"), titled *The Shift*. The Defendants worked under the guidance of Defendants Detective William Benjamin and Detective Kevin Kelly (the "Supervisors"). All four of the Detectives and at least one supervisor, Defendant Kelly, were being paid by Discovery for their participation in *The Shift*. Defendant Benjamin was the IMPD's authorized representative for purposes of *The Shift*, and as such he signed a production contract and an Access and Location Release.

On the night of November 3, 2008, three armed men approached the residence of 2710 Bluffwood Drive, Indianapolis, Indiana. Richard Miller and Duane Miller were inside the residence, and Ricky Blueitt and Kourtney Glasscock were sitting in a car outside the home. As the armed men approached, one man held Glasscock at gunpoint while the other two men and Blueitt entered the residence. Inside the residence, one of the men, wearing a mask, shot Richard Miller. The other man, wearing a hooded sweatshirt, shot Duane Miller. Duane Miller survived his injuries, but Richard Miller died that evening as a result of his injuries. Ultimately, there were four witnesses to the crime: Duane Miller, Blueitt, Glasscock, and Tamela Daniels, who was inside the house at the time of the shootings.

Mannina, Moore, Breedlove, and Tudor investigated the events that occurred at the Bluffwood residence on November 3 under the guidance of the Supervisors. As part of their

investigation, the Detectives obtained video surveillance footage from outside the Bluffwood residence and solicited statements from Duane Miller, Blueitt, Glasscock, and Daniels. All four witnesses informed the Detectives that they did not clearly see the perpetrators, though they suspected that the shooters were in their twenties, and Blueitt stated that he and the victims likely knew the shooters. Based on this initial investigation, the Detectives and Duane Miller both suspected that Blueitt knew the shooters and was involved in the crime.

After seeing some surveillance footage stills, a friend of Blueitt who was not a witness to the shootings noticed similarities between the image of one of the shooters and an image he had seen on the social networking page of Samuel Swavely. Blueitt's friend then identified Swavely as the man who had shot Richard Miller. Swavely, a minor at the time, had also posted a music video on the same webpage that included brief images of the Plaintiff, Carlton Hart. After hearing about the resemblance between the man in the music video on Swavely's webpage and the image of Richard Miller's shooter from the surveillance footage, Duane Miller watched the music video on Swavely's webpage and subsequently identified Hart as the man who had shot him.

After Miller notified the Detectives of his belief that Hart was one of the shooters, the Detectives created a photo line-up, which included a photograph of Hart, to show to the witnesses despite their previous statements that they were not able to see the faces of the shooters. All four witnesses had also already viewed Hart's image on the webpage. Although the witnesses' earlier descriptions were not consistent with Hart's appearance, and Hart's appearance was not consistent with the surveillance images of the shooters, each witness then identified Hart as one of the perpetrators of the shooting. The Detectives knew that the witnesses

had already viewed Hart's image, but they only conducted a single photo line-up for each witness, did not alter the photo line-up for any of the witnesses, and did not assure that the witnesses did not communicate with each other prior to their individual photo line-up analyses.

The Detectives knew that no probable cause existed for Hart's arrest, and they knew they could only secure a warrant for his arrest by withholding information about the deficiencies in the photo line-up identification. Although the Detectives knew that Hart was likely not involved in the shootings, the Detectives applied for a warrant for Hart's arrest on December 3, 2008, which was supported by the Detectives' own probable cause affidavit. The Detectives were granted an arrest warrant for Hart, and Hart was arrested the same day.

Upon his arrest, the Detectives interviewed Hart, who maintained his innocence and offered an alibi as to his whereabouts on the night of November 3, 2008. The Detectives did not investigate, verify, or discredit Hart's proffered alibi. Furthermore, the Detectives discovered and then suppressed evidence that tended to exculpate Hart, including phone and computer records, witness testimony confirming Hart's alibi, and DNA samples taken from bullet shells found at the Bluffwood residence that did not match Hart. Further, in support of his innocence, Hart underwent and passed three polygraph examinations in February 2009. Nonetheless, the Detectives urged Hart's prosecution, with the support of their Supervisors, who knew about the Detectives' conduct in securing the identification of Hart.

In March 2009, Adrian Rocket informed the Detectives that he had sold Hart a gun matching the type used to shoot Miller, but he did so only after coaching by the Detectives.

In late 2009, Blueitt told the Detectives that he was unsure whether Swavely and Hart

were the shooters. The Detectives encouraged Blueitt to maintain his identification, and did not inform Noah Schaffer, the deputy prosecutor overseeing the case, or defense counsel that Blueitt was having second thoughts. Blueitt later gave a taped statement to another officer regarding his doubt about the identifications, and stated that Mannina had pressured him to stand firm in his identification. On December 14, 2009, Blueitt made these same statements in court. Nevertheless, the Detectives, with the Supervisors' knowledge and acquiescence, continued to urge Hart's prosecution.

On October 20, 2010, the charges against Hart were dismissed for an "insufficient nexus between defendant and crime," and Hart was released, having spent almost two years in jail awaiting trial.

Hart filed suit against the Defendants on December 2, 2010, and the Defendants removed the case to this Court on December 23, 2010. Three months later, on March 31, 2011, Hart filed his amended complaint, setting forth seven claims for relief. Specifically, Hart alleges claims against the Defendants for (1) making false or misleading statements in support of a probable cause affidavit; (2) false arrest/false imprisonment; (3) malicious prosecution; (4) abuse of process; (5) speedy trial violation; (6) making false or misleading statements in support of opposition to bail; and (7) defamation. Hart seeks compensatory, consequential, reputation, and punitive damages, as well as attorney fees and costs. He seeks injunctive relief from only Defendants Lucky Shift, Inc., Discovery Communications, LLC, and Discovery Communications, Inc.

The Defendants now seek judgment on the pleadings as to Hart's claims against the Detectives in their official capacities, the Supervisors in their individual and official capacities,

the city officials in their official capacities, the IMPD, the Indianapolis Department of Public Safety, and the City of Indianapolis.

### III. DISCUSSION

#### A. Claims against the City of Indianapolis, the IDPS, and the Individual Defendants in their Official Capacities

The Defendants seek judgment on the pleadings regarding Hart's claim against the City of Indianapolis, IDPS, and all named individual Defendants in their official capacities because, they assert, Hart has not sufficiently pled a municipal policy or custom pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690-91 (1978).

Claims against officials in their official capacities are treated as claims against the governmental entity itself. *Grieveson v. Anderson*, 538 F.3d 763, 771(7th Cir. 2008). Accordingly, a claim against an official in his official capacity must satisfy the standards set out in *Monell. E.g.*, *id.* A local governmental entity is only liable under § 1983 "when execution of a government's policy or custom . . . inflicts the injury." 436 U.S. at 694. To state a claim under *Monell*, a plaintiff must plead "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with 'final policymaking authority.'" *McTigue v. Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

The Defendants argue that Hart's claim fails because he does not plead an injury caused by an express policy or policymaker, and because Hart's claim that a custom or usage exists is deficient. Hart argues that there exists a "general custom of permitting Defendant Detectives to disregard constitutional limitations in favor of securing arrests and convictions." The Defendants

argue that, even if this custom existed, Hart's claim fails because he must plead more than a single incident to establish municipal liability.

Before *Bell Atlantic v. Twombly*, the United States Supreme Court held that complaints against municipal corporations asserting liability under § 1983 needed only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (citing Fed. R. Civ. Pro. 8(a)(2)) (striking down the Fifth Circuit's "heightened pleading standard" in municipal liability cases, which required a plaintiff to plead more than a single instance of misconduct). District courts in this Circuit have affirmed this standard since *Twombly*, applying it through the new lens set forth in *Twombly*: "an official capacity claim can survive even conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing." *Riley v. County of Cook*, 682 F.Supp.2d 856, 861 (N.D. Ill. 2010). In assessing whether the complaint meets this standard, the court undertakes "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009).

To this end, Hart has specifically alleged that the Defendants pressured witnesses, relied on identifications obtained by faulty procedures, suppressed evidence, and failed to investigate Hart's alibi.[2] Hart has supported these assertions with detailed accounts of the manner and timing

---

[2] Regardless of whether, as Defendants argue, these acts are themselves actionable, the Court may consider these allegations as serving the notice function of informing the Defendants of the underlying basis for Hart's claims.

of these actions.[3] Insofar as these specific factual allegations, if true, detail the underlying acts constituting Hart's overarching enumerated claims, the Court finds that Hart's allegations rise above a speculative level. It is certainly plausible that a group of police detectives who pressured witnesses, relied on faulty identifications, suppressed evidence, and failed to investigate alibis were acting according to an unwritten custom within their department if their supervisors were condoning such actions. Hart's detailed allegations thus provide the Defendants notice of the nature of the custom alleged to exist. For this reason, the Defendants' motion for judgment on the pleadings as to the City of Indianapolis, IDPS, and all individual defendants in their official capacities is **DENIED**.[4]

### B. Claims Against the Defendant Supervisors in Their Individual Capacities

The Defendants next seek judgment on the pleadings as to Hart's claims against the Defendant Supervisors in their individual capacities. In support, the Defendants argue that *Ashcroft v. Iqbal* established that in a § 1983 suit, government officials are only liable for their own misconduct. 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). Indeed, *Iqbal* established that

---

[3] Hart extensively cites the declaration of an expert witness in his response, and attaches the expert's report to his response as an exhibit. If, on a motion under Rule 12(c), "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. Pro. 12(d). Rather than convert this motion to a motion for summary judgment, the Court has chosen to not consider the expert's report, as well as all statements from the report cited in Hart's response, in making this ruling.

[4] Hart also argues that he has established an unconstitutional policy and a final decision by a policymaker by way of the Municipal Defendants' "specific authorization and direction" that the Detectives participate in *The Shift*. This decision, so Hart argues, amounts to a "custom, policy, and/or decision that the Defendant Detectives present their police work as televised entertainment." Because the Court finds that Hart has sufficiently alleged a custom of permitting the Detectives to disregard constitutional limitations in pursuit of arrests and convictions, it need not address this alternative argument.

government officials must be personally responsible to be held liable, but *Iqbal* further clarified the ways in which a government official could incur personal responsibility. Notably, supervisors may be personally liable for the acts of their subordinates if they knew "about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988), *cited with approval in Backes v. Village of Peoria Heights, Ill.*, - - - F.3d - - - , 2011 WL 5505348 at *2 (7th Cir. Nov. 10, 2011).

The Defendants argue that Hart fails to allege knowledge and facilitating, approving, or condoning of the Detectives' conduct that rises above a speculative level. In reviewing the pleadings for sufficiency under *Iqbal* and *Twombly*, the Court first separates legal conclusions from factual allegations. *See Iqbal*, 129 S.Ct. at 1951. Legal conclusions are not entitled to the assumption of truth, while factual allegations contribute to the plausibility of the plaintiff's claim. *See id.*

In this case, Hart's underlying factual allegations, which are entitled to the assumption of truth, detail conduct specific enough to permit the inference that the Defendant Supervisors *did* know about the Detectives' conduct, and turned a blind eye to it. Specifically, Hart alleges that "other police officers expressed concern about Defendant Detectives' tactics to Defendant Supervisors. . . . [but] Defendant Supervisors continued to support the Defendant Detectives in pressing for Mr. Hart's continued incarceration and prosecution." Furthermore, Hart alleges that the Supervisors were aware of Hart's innocence and suppressed evidence of it. These allegations close the inferential gap between Hart's explanation and alternative explanations for the

Detectives' ability to conduct themselves as alleged and provide the requisite notice to the Defendant Supervisors regarding the alleged conduct. *Cf. Iqbal*, 129 S. Ct. at 1951-52. For this reason, the Defendants' motion for judgment on the pleadings as to Hart's claims against the Defendant Supervisors in their individual capacities is **DENIED**.

## C. Defendant Supervisors' Entitlement to Qualified Immunity

The Defendants argue that the Supervisors are also shielded from liability by the doctrine of qualified immunity. Government officials are protected from liability for civil damages by qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining whether a government official is entitled to qualified immunity requires a two-part analysis: the court must decide (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. *E.g.*, *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The Defendants argue that, because there is no supervisory liability under § 1983, there can be no constitutional violation, much less a violation of a constitutional right that is clearly established. However, by virtue of the analysis above, the Court finds that Hart has sufficiently alleged a constitutional violation by the Defendant Supervisors insofar as they are alleged to have known about the Detectives' conduct and facilitated it, condoned it, approved it, or turned a blind eye to it. Moreover, this right was clearly established as early as 1988. *See Jones*, 856 F.2d at 992-93. For this reason, the Court **DENIES** the Defendants' claim for judgment on the pleadings as to the Defendant Supervisors on the basis of qualified immunity.

### D. Malicious Prosecution and Abuse of Process Claims

The Defendants argue that Hart cannot state a claim for malicious prosecution or abuse of process arising from the Due Process Clause under § 1983 because state law remedies exist.

Assuming "that some of the interests granted historical protection by the common law of torts (such as the interest[ ] in freedom from . . . malicious prosecution) are protected by the Due Process Clause[,] . . . [Supreme Court] precedents make clear that a state actor's random and unauthorized deprivation of that interest cannot be challenged under 42 U.S.C. § 1983 so long as the State provides an adequate postdeprivation remedy." *Albright v. Oliver*, 510 U.S. 266, 283-84 (1994) (Kennedy, J., concurring) *cited in Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001)(explaining that Kennedy's opinion, "as the narrowest ground of decision, constitutes the effective holding of the Court"). When a state law remedy exists, due process of law is afforded by the opportunity to pursue a claim in state court. *Newsome*, 256 F.3d at 751 (analyzing *Albright*). Thus, "satisfying the elements of the state-law tort of malicious prosecution *knocks out* any constitutional tort of malicious prosecution." *Id.* (emphasis in original). The same can be said for the tort of abuse of process.

Indiana provides for claims for malicious prosecution and abuse of process. *E.g.*, *Lindsay v. Jenkins*, 574 N.E.2d 324 (Ind. Ct. App. 1991); *Livingston v. Indianapolis*, 398 N.E.2d 1302 (Ind. Ct. App. 1979). In this case, however, these claims are barred by official immunity. Ind. Code § 34-13-3-3(8). Hart contends that because Indiana has granted its officials immunity from state law malicious prosecution and abuse of process claims, state law remedies have been withheld and his due process claim is therefore cognizable under § 1983.

11

To state a due process claim under § 1983, the plaintiff must allege that the state procedures for redressing injuries of this kind are constitutionally inadequate. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 677, 679-80 (1986) (Stevens, J., concurring). The existence of immunity from certain types of claims does not render a State law remedy constitutionally defective. *Id.* at 680. As Justice Stevens has explained,

> In my judgment, a state policy that defeats recovery does not, in itself, carry that consequence. Those aspects of a State's tort regime that defeat recovery are not constitutionally invalid, so long as there is no fundamental unfairness in their operation. Thus, defenses such as contributory negligence or statutes of limitations may defeat recovery in particular cases without raising any question about the constitutionality of a State's procedures for disposing of tort litigation. Similarly, in my judgment, the mere fact that a State elects to provide some of its agents with a sovereign immunity defense in certain cases does not justify the conclusion that its remedial system is constitutionally inadequate. There is no reason to believe that the Due Process Clause of the Fourteenth Amendment and the legislation enacted pursuant to § 5 of that Amendment should be construed to suggest that the doctrine of sovereign immunity renders a state procedure fundamentally unfair.

*Id.* at 681. Rather, due process is afforded by way of the legislative process ultimately granting immunity. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432 (1982) (explaining that "the grant of immunity arguably did deprive the plaintiffs of a protected property interest. But they were not thereby deprived of property without due process, just as a welfare recipient is not deprived of due process when the legislature adjusts benefit levels. . . . In each case, the legislative determination provides all the process that is due."); *Martinez v. California*, 444 U.S. 277, 282, n.5 (1980) (stating that "[i]t is arguable, however, that the immunity defense, like an element of the tort claim itself, is merely one aspect of the State's definition of that property interest," and there is "no merit in the contention that the State's immunity statute is unconstitutional when applied to defeat a tort claim arising under state law"). Therefore, the provision of immunity

does not render the state postdeprivation remedy constitutionally inadequate, and Hart has not alleged any other way in which the state law remedies are constitutionally inadequate. The state law remedies thus knock out Hart's claims for malicious prosecution and abuse of process under the Due Process Clause and § 1983. For these reasons, the Defendants' motion to dismiss Hart's claims for malicious prosecution and abuse of process is **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Defendants' motion for partial judgment on the pleadings as to Hart's claims (1) against the City of Indianapolis, IDPS, and all officials in their official capacities, and (2) the Defendant Supervisors in their individual capacities. The Court **GRANTS** the Defendants' motion for partial judgment on the pleadings as to Hart's § 1983 claims based on malicious prosecution and abuse of process.[5]

SO ORDERED: 01/23/2012

*[signature: William T. Lawrence]*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication

---

[5] While the Defendants initially challenged Hart's Sixth Amendment claim, they have withdrawn their challenge in light of *Blake v. Katter*, 693 F.2d 677 (7th Cir. 1982), and *Jones v. Chicago*, 856 F.2d 985 (7th Cir. 1988).