## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **CARLTON HART,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **CAUSE NO. 1:10-cv-01691-WTL-DML** |
| | ) |
| **CHRISTINE MANNINA, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

### ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendants' motion for summary judgment (dkt. no. 176). The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.

### I.        STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not

required to scour the record in search of evidence to defeat a motion for summary judgment."

*Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.   BACKGROUND

The facts that follow are those taken in the light most favorable to Hart.

### A.  The Miller Incident

On the evening of November 3, 2008, Richard Miller, Duane Miller, and Ricky Bluiett[1] were inside their northwest Indianapolis home.  Around 8:30 p.m., Tamela Daniels, a friend of Duane's, arrived at the home and went into a bedroom to talk with Duane.  Shortly thereafter, around 8:38 p.m., Bluiett's girlfriend, Kourtney Glasscock, arrived at the home.  She parked her car in front of their house, and Bluiett came out and got into her car to talk.

Bluiett and Glasscock sat in Glasscock's parked car talking for several minutes when, around 8:46 p.m., three armed men approached the car and ordered the couple to get out. Glasscock was pulled out of the car and taken to the side of the house by one of the men where she was held at gunpoint.  Bluiett went into the house with the two other men.  Once in the house, the men encountered Richard; a struggle ensued between one of the men who was wearing a mask and Richard, and then Richard was shot several times.

Meanwhile, the other man, wearing a hooded sweatshirt, proceeded into the bedroom where Duane and Daniels were talking.  The man shot Duane, and Daniels jumped into a closet. The two men then ran out of the front door and fled the scene.  A few seconds later, Glasscock went back to her car to retrieve her cell phone and call 911.  The police and paramedics responded to the call; unfortunately, Richard died of his injuries later that night.

---

[1] It is not clear to the Court how Ricky Bluiett's last name is spelled.  While both Hart and the Defendants use the spelling "Blueitt," Ricky Bluiett himself testified that his last name is spelled "Bluiett."  *See* dkt. no. 190-17 at 30.  For the purpose of this motion, the Court will use the spelling that Ricky Bluiett himself gave.

### B.  The Initial Investigation

Defendant Officers Christine Mannina and Lesia Moore, as well as Defendant Sgt. Jeff Breedlove, Mannina's direct supervisor, responded to the scene of the crime along with nonparty Officers Jesse Beavers and Tom Tudor.  Mannina was eventually assigned as the lead detective on the case.  Defendant Lt. Kevin Kelly, Sgt. Breedlove's immediate supervisor, went to the hospital where Richard and Duane were taken, but remained in contact with Officer Tudor while he was at the home.  While at the home, crime lab technicians collected all of the physical evidence at the crime scene.  A surveillance video was also collected.

Later that evening and into the early morning hours, the officers returned to the Indianapolis Metropolitan Police Department ("IMPD") homicide office to interview Bluiett, Glasscock, and Daniels.  Duane, who was at the hospital at the time, was interviewed the next day at his mother's home.  The witnesses provided the following descriptions of the man who shot Duane:

- Bluiett was interviewed by Officers Mannina and Moore.  He identified the person who shot Duane as a short, black male, wearing glasses and a black hoodie.

- Glasscock was interviewed by Officer Mannina and Sgt. Breedlove.  She identified the man who shot Duane as a black male with a round face, in his late twenties to early thirties, wearing a black sweatshirt and prescription glasses.

- Daniels was interviewed by Officers Mannina and Moore.  She identified the man who shot Duane as a black male, wearing a black hoodie and glasses.

- Duane was interviewed by Officers Mannina and Moore.  He identified the person who shot him as a black male in his mid-twenties, wearing a dark gray hoodie and round glasses.

All of the witnesses stated that they did not clearly see the man who shot Duane, as the crime happened quickly, occurred at night, and his face was difficult to see due to his hooded sweatshirt.  Further, during Bluiett's interview, he informed Mannina and Moore that he likely

knew the shooters.  This, coupled with his suspicious actions after the murder and the fact that he looked directly at the surveillance video before he exited the home to talk with Glasscock in her car, led him to be suspected of being involved in the crime.

### C.  The Investigation Continues

Mannina continued to investigate the case, as she was assigned as the lead detective. Defendant Deputy Chief Benjamin eventually released still photos from the surveillance tape that captured the suspects, asking the public to call IMPD if they had any information regarding their identities.

Around November 10 or 11, 2008, Bluiett called Mannina and informed her that he believed Samuel Swavely was the man who shot Richard.  He developed this belief after a friend viewed Swavely's MySpace page and suggested to Bluiett that Swavely looked like one of the masked gunmen in the surveillance tape he had seen.  Armed with this new information, Mannina conducted a photo array with both Bluiett and Glasscock.  Bluiett identified Swavely from the photo array, but Glasscock did not identify anyone.  Mannina subsequently interrogated Swavely about the Miller Incident; however, he was released after he denied any involvement in the murder.

On November 19, 2008, Duane informed Mannina that he believed one of the men in a music video on Swavely's MySpace page was the man who shot him.  Duane was shown this video by his mother after she learned that Swavely was a possible suspect in the case.  Mannina viewed the video with Duane at his mother's house and also took a photo of the man in the music video hoping to identify him.

On November 21, 2013, Mannina received a telephone call from one of Duane's cousins. The cousin informed Mannina that the man Duane identified as the man who shot him was the

Plaintiff, Carlton Hart.  The cousin stated that he knew this because he had known Hart for a long time.  He also told Mannina that Hart did not seem like the type of person who would be involved in a murder.

### D.  Plaintiff Carlton Hart is Identified as a Suspect

On November 22, 2008, Mannina conducted a photo array—containing six pictures—with Duane, Bluiett, Glasscock, and Daniels.  Mannina asked each of them if they recognized anyone from the night of the shooting.  When they responded affirmatively, she turned on a tape recorder to capture the identification.  Both Bluiett and Daniels identified Hart as the man who shot Duane.  Duane also identified Hart as the man who shot him.  Glasscock identified Hart as one of the men who was present on the night in question.

Thereafter, Mannina drafted an affidavit of probable cause for Hart's arrest, which she had Lt. Kelly review.  Mannina then met with Deputy Prosecutor Denise Robinson to screen the case.  Robinson reviewed the affidavit and the accompanying case file, and also interviewed Duane who confirmed Hart was the person who shot him.  Robinson then signed the affidavit, concluding that there was sufficient evidence to arrest Hart.  A warrant was issued and Hart was arrested on December 3, 2008.

### E.  Hart's Prosecution

After Hart's arrest, the investigation into the Miller Incident continued.  On March 4, 2009, Mannina and Moore interviewed Adrian Rockett, a man who was arrested for a residential burglary, after he informed them that he had information regarding a homicide.  During the interview, Rockett informed Maninna that he sold a .40 caliber handgun to Hart three months before the Miller Incident.  Rockett, however, was unable to identify Hart when he was presented with a photo array—he selected several others from the photo array.  Mannina and Moore then

pressured Rockett until he finally identified Hart.  They also directed him to sign off on his identification, even though he was hesitant to do so.  Meanwhile, Sgt. Breedlove was watching the interview of Rockett from a live feed on his computer.  He later informed Mannina that she was too suggestive with Rockett, and that she should not have encouraged him to sign the array because of his hesitancy.  The signed array was provided to the prosecutor's office for use against Hart; however, the prosecution later decided not to use Rockett as a witness.

On December 11, 2009—the Friday before Hart and Swavely's trial was to begin—Bluiett informed the prosecutor that he was not completely confident in his identification of the two men.  As a result of this new information, Bluiett was re-interviewed by Sgt. Breedlove and Lt. Kelly.  During the interview, Bluiett revealed that he was never one hundred percent positive in his identification.  He also stated that Mannina had come to his home to discuss the identification, and that he felt she was trying to convince him that Hart and Swavely were the men involved in the Miller Incident.  Bluiett also testified in court to this effect during a hearing held on December 14, 2009.

Accordingly, the charges against Swavely were dismissed, as the only evidence against him was the now-tainted identification made by Bluiett.  Hart's charges were not dismissed, although his trial was continued, because the identifications by Duane, Glasscock, and Daniels were believed to not be similarly tainted by Mannina.  In all, Hart's trial was continued a total of 363 days, the duration of which he remained in jail.

### F.  The Eventual Dismissal of Charges Against Hart

On October 20, 2010—nearly two years after his arrest—the charges against Hart were dismissed due to an "insufficient nexus between defendant and crime."  No physical evidence collected during the investigation was ever connected to Hart.  Additionally, Glasscock was

unable to replicate her identification of Hart when she was presented with a photo array during her deposition.  Finally, Hart's alibi for the night of the Miller Incident—that he was at his music studio—was corroborated by a witness.

### G. *The Shift*

In April 2008, Mannina was approached by Lucky Shift, LLC regarding a possible television show.  Thereafter, Lucky Shift partnered with Discovery Communications, LLC to produce a reality television police drama, *The Shift*, that focused on the life and crimes of the middle shift[2] homicide detectives of the IMPD.  A crew was to film the detectives from July 2008 through November 2008, with the first six episodes airing from December 21, 2008, through January 25, 2009.  The detectives, including the Defendants, were compensated for their involvement with *The Shift*.

Filming was under a "time crunch" and the production schedule had to be altered because the episodes centered on active homicides.  In all, a total of twenty-six episodes were filmed. The final episode of season one, *Brother's Keeper*, followed the middle shift detectives while Mannina investigated the Miller Incident.  This episode aired on January 25, 2009.  On March 6, 2009, Lucky Shift destroyed all of the raw footage created during the filming of season one— including the footage that was created during the investigation of Hart.

### III.   DISCUSSION

Hart filed suit against the Defendants on December 2, 2010, and the Defendants removed the case to this Court on December 23, 2010.  In his third amended complaint (dkt. no. 174), Hart asserts three counts against the Defendants:  1) a 42 U.S.C. § 1983 claim for making false or misleading statements in support of a probable cause affidavit in violation of the 4th and 14th

---

[2] The "middle shift" detectives work between the hours of 2:00 p.m. and 10:30 p.m.

Amendments; 2) a § 1983 claim for false arrest/imprisonment in violation of the 4th and 14th Amendments; and 3) a § 1983 claim for denying Hart a speedy trial in violation of the 6th and 14th Amendments.

Each of the Defendants move for summary judgment on all counts brought against them. Their arguments will be addressed, in turn, below.

### A. Preliminary Issues

Before the Court delves into the substantive merits of the pending motion, it needs to resolve several preliminary items raised by the parties.

#### 1. Hart's present incarceration

Hart, in his response to the Defendants' motion for summary judgment, requests that this Court "strike as irrelevant, prejudicial, and scurrilous all references to Hart's current incarceration pending trial" . . . as their "only purpose in including this information is to attempt to distract or dissuade the Court from Defendants' own misconduct and portray Hart as a criminal." Pl.'s Response at 46. The Court notes that in making this request, Hart actually directed more attention to his present incarceration. Nevertheless, the Court agrees that Hart's current incarceration is of no concern to his present lawsuit, and the Court did not consider that fact in ruling on the summary judgment motion.

#### 2. Affidavits of Duane, Bluiett, Glasscock, Daniels, and Robinson

Hart next asks this Court not to consider the affidavits of Duane, Bluiett, Glasscock, Daniels, and Denise Robinson,[3] as the Defendants failed to timely produce these statements. In the alternative, Hart requests that the Court stay the summary judgment motion to allow him to take their depositions. The Court will not do either.

---

[3] Dkt. Nos. 179-1 through 179-4 and Dkt. No. 179-12.

First, the Court does not agree with Hart that the affidavits were not timely produced. The affidavits are signed and dated the last week of June 2013, just prior to the filing of the summary judgment motion. Whether or not the documents existed prior to that time is irrelevant—an affidavit is not an affidavit until it is signed. Second, this case has been pending since December 2010, and all of the affiants, save Denise Robinson, were mentioned in Hart's complaint. If Hart desired to take the depositions of those witnesses, he had ample time to do so. The affidavits, therefore, are proper and will be considered as evidence in support of the Defendants' summary judgment motion.

### 3. *Hearsay evidence: Out-of-court statements and electronic communications*

Finally, the Defendants argue that several exhibits[4] Hart produced in his response to the summary judgment motion are inadmissible hearsay. For the purpose of this ruling, the Court considered all of the exhibits, and still found that summary judgment was warranted for all Defendants. It need not, therefore, determine if some of Hart's exhibits were inadmissible hearsay.

## B. Defendant Officer Moore

Turning now to the substantive motion, Moore moves for summary judgment on all claims against her in Hart's third amended complaint, arguing that she is not personally liable to Hart because she was not responsible for Hart's alleged constitutional violations. Moore is correct that in order for § 1983 liability to attach, she has to be found personally responsible for Hart's constitutional deprivations. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614 (7th Cir. 2002) ("It is well-established that a plaintiff only may bring a § 1983 claim against

---

[4] Specifically, the exhibits are dkt. nos. 190-2 through 190-8; dkt nos. 190-10 through 190-13; dkt. nos. 190-28 through 190-31; dkt. nos. 190-45 through 190-46; dkt. nos. 190-48 through 190-49; and dkt. nos. 190-56 through 190-59.

those individuals personally responsible for the constitutional deprivation.").  However, Moore need not have directly participated in the alleged violations if she either "act[ed] or fail[ed] to act with a deliberate and reckless disregard of [Hart's] constitutional rights" or if "the conduct causing the constitutional deprivation occur[ed] at her direction or with her knowledge and consent." *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)).  While Hart is correct that "Moore was directly involved in the criminal investigation," Pl.'s Surreply at 8, the Court does not agree that she was "personally involved," in the specific actions that led to the Fourth Amendment violations alleged by Hart.

It is clear that Moore had no personal involvement in the drafting or review of the probable cause affidavit.  It was drafted by Mannina only. *See* Mannina Dep. at 108: 20-22; s*ee also* Moore Dep. at 51:11-55:8.  It is also undisputed that Moore had no involvement in the arrest of Hart—again, Mannina was the only person who arrested Hart, based on four independent eyewitness identifications. *See* Moore Dep. at 189: 2-7.  While Hart raises numerous issues with those identifications, the evidence of record indicates that Moore had no involvement in presenting the photo arrays to the witnesses that eventually led to the identification of Hart:

> Q:  And I think you've testified to this, but I want to make sure.  It sounds like you were not directly involved in arranging the photo arrays that included Carlton Hart in any way other than just being there?
>
> A:  No, I was not there.
>
> Q:  You were not even there for the display of the photo arrays that included Carlton Hart?
>
> A:  No.
>
> Q:  And you were there for—I take it, but I'm trying to figure out if that's true or not.  You were not involved in any way of the photo arrays that displayed Carlton Hart's photograph?
>
> A:  No.

*Id*. at 68: 6-19.  Because the alleged constitutional violations stemming from Hart's Fourth Amendment claims cannot be attributable to her conduct, the Court **GRANTS** Moore's motion for summary judgment on Counts I and II in Hart's third amended complaint.

With regard to his speedy trial claim, Moore had no involvement in the case after Hart was arrested and detained at the Marion County Jail, except to interview Adrian Rockett.  It is clear that part of Hart's speedy trial claim hinges on the alleged misconduct of Moore during this interview.  As such, the Court finds that she was personally involved in some conduct that allegedly led to Hart's Sixth Amendment violation.  The Court will thus address Moore's claim for summary judgment on Count V below.

### C.  Defendant Officer Mannina – Fourth Amendment Violations

In Count I, Hart challenges the truthfulness of the information contained in Mannina's affidavit in support of probable cause for his arrest.  *See Franks v. Delaware*, 438 U.S. 154 (1978).  Mannina argues that she is entitled to summary judgment on Count I because she did not make any false statements or omit any known facts in the affidavit of probable cause.  It is well-established that "[a]warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003)).  The Seventh Circuit has stated "that a reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Id*. (internal quotation marks omitted).

11

Hart argues that Mannina's probable cause affidavit was false and misleading for two separate reasons:  1) Mannina knew the eyewitness identifications were unreliable; and 2) Mannina omitted material, exculpatory information that, if included, would have led the judge to deny her request for an arrest warrant.  The Court will address each argument, in turn.

### 1.   *Eyewitness Identifications*

It is clear that the sole support for Mannina's probable cause affidavit was the four independent eyewitness identifications of Hart.  Hart argues that Mannina knew these identifications were insufficient to establish probable cause because they were unreliable.  He asserts Mannina coached each witness to identify him, or, alternatively, that Mannina knew, or should have known, that the witnesses colluded to identify Hart.  The Court does not agree.

The evidence of record lends no support to the suggestion that the witnesses colluded to identify Hart.  There is no evidence to suggest the witnesses circulated Swavely's MySpace page prior to their identifications—in fact, Mannina specifically asked both Glasscock and Daniels if they had seen the MySpace page prior to their identifications of Hart, to which the witnesses responded "no." *See* Mannina Dep. at 113:20-114:6.  Mannina also stated, "I have no reason to believe they were lying to me." *Id.* at 114: 12-13; *see also, e.g.*, dkt. no. 179-3 ¶ 31 ("I never saw Carlton Hart on a MySpace page prior to my identification of him on November 22, 2008.").  The fact that the MySpace page "was circulating throughout the Miller family" does not mean that Glasscock and Daniels—who are not members of the Miller family—saw the page prior to their identifications.  The witnesses were also not present with each other when they identified Hart, and none of them discussed their identifications with each other. *See, e.g., id.* ¶¶  29-30 ("I did not discuss my identification of Carlton Hart with Duane Miller, Ricky Bluitt [sic], or Kourtney Glasscock, on November 22, 2008 . . . I was not present when Officer Mannina

interviewed Duane Miller, Ricky Bluitt [sic], or Kourtney Glasscock[.]").  There is simply no evidence of collusion.

Further, the eyewitnesses maintain that they were not coached by Mannina, and Mannina has stated that in no way were any of them "less than certain in regards to the identification of Carlton Hart." Dkt. No. 190-1 at 65; *see also, e.g.*, dkt. no. 179-3 ¶¶ 25-27 (indicating no one "coached," "pressured," or " threatened" the witness to pick Hart).[5]  Nevertheless, Hart alleges that because Mannina coached Bluiett and Rockett to identify Hart, a reasonable jury could infer that she coached all the witnesses.  This is simply not true.  Bluiett himself testified that he was not pressured by Mannina at the time the identification was made to select Hart:

> Q:  Mr. Bluiett, when the photo array was shown to you, uh, was any suggestion made to you at that time who you needed to pick?
>
> A:  No.

Dkt. No. 190-17 at 33.  The only evidence that Hart has, therefore, is that about a month after Bluiett's identification, Mannina visited him and told him that he needed to be one-hundred percent sure of his identification, and that she was sure she had the right guy. *See* dkt. no. 190-17 at 31-34.[6]  The Court does not believe that it is a reasonable inference to make that because Mannina did this, she must have coached *all four witnesses* into identifying Hart as a suspect.

---

[5] Hart argues that "the witnesses' affidavits do not lay a foundation sufficient to establish their expertise to testify whether Mannina['s] . . . conduct of the photo array were improperly suggestive." Pl.'s Response at 48.  The Court does believe any expertise is needed to state that one did or did not feel coached, threatened, or pressured to do something.

[6] It is not entirely clear to the Court whether Bluiett was unsure of his identification of Hart *and* Swavely or just that of Swavely.  The transcript of the hearing held on December 14, 2009 seems to focus on Bluiett's identification of Swavely.  This is bolstered by the fact that the judge specifically told Hart's attorney that "I'm not sure you've got a dog in this hunt yet, but I'll let you ask him questions that you want as it related to this." Dkt. No. 190-17 at 33.  Similarly, Bluiett's own affidavit states that he was only unsure of his identification of Swavely. *See* dkt. no. 179-2 ¶ 42.  However, the transcript of Bluiett's interview with Sgt. Breedlove and Lt. Kelly indicates that he was "pretty sure but not completely sure about the *two people* that they're havin' me testify against on Tuesday." Dkt. No. 190-4 at 2 (emphasis added).

The same is true with respect to Rockett.  The Court does not find it reasonable to infer that because Mannina may have conducted a less-than perfect interview with a potential witness, that she coached *all four* witnesses to identify Hart nearly four months earlier.

Essentially what Hart asks the Court to do is allow this case to proceed to a jury on pure speculation that Mannina coached the witnesses or knew they were colluding to identify Hart. On summary judgment, speculation is not enough. *See Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 931-32 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").  The Court does not agree that a reasonable jury could infer from the facts cited above that Mannina coached the witnesses into identifying Hart or that she knew they were in cahoots together.

Hart next argues that "a jury could reasonably conclude that Mannina . . . coached or led the witnesses to identify" him because:  1) Mannina initially failed to record the interviews where she presented the photo arrays to the four eyewitnesses—she had them first confirm they could identify someone from the photo array *and then* turned on the recording to capture the identification; and 2) the raw footage of *Brother's Keeper* was "suspiciously" destroyed just three days after a formal request to preserve it.  Hart speculates that this was because Mannina was coaching the witnesses to identify him and wanted to "ensure[] that no record survived of the improper presentation." Pl.'s Response at 23.  Again, the Court does not agree that it would be reasonable for the jury to make this inference.

First, Swavely's attorney did not "file a motion to compel Lucky Shift to preserve its raw footage." Pl.'s Response at 20.  Rather, his attorney served a request for specific discovery on the State of Indiana, asking it to produce "[c]opies of any and all contracts and/or agreements

between" IMPD and Discovery. Dkt. No. 190-18.[7]  This is not the same as a motion to compel

preservation of certain evidence.  Further, there is simply no support in the record for Hart's

repeated allegation that the destruction of the raw footage was "a deviation from Lucky Shift's

regular destruction policy." Pl.'s Response at 20.  Lucky Shift's policy was to keep raw video

footage until *approximately* thirty days after the episode aired, when it was sent to a shredding

company.  Pauline Mason, Lucky Shift's President, specifically confirmed this approximate time

frame:

> Q:  So there should be invoices correlating to 30 days after each episode aired;
> right?
>
> A:  I don't know if exactly that's how it worked.  Maybe sometimes we would
> just, you know, give maybe two shows to the shredding company.  So it wouldn't
> exactly be 30 days[.]

Mason Dep. at 122: 20-25.  *Brother's Keeper* aired January 25, 2009, and the raw footage of that

episode was destroyed on March 5, 2009—thirty-nine days later.  This is certainly well within

the *approximate* thirty-day time frame and is not a deviation from its regular policy.

    There is also nothing to suggest that Mannina, or any other Defendant, had anything to do

with the destruction of the raw footage. *See* dkt. no. 179-20 ¶¶ 10-11 ("Neither IMPD nor the

Marion County Prosecutor's Office have ever had possession of the raw video footage relating to

the Defendants in this action . . . Neither IMPD nor the Marion County Prosecutor's Office has

instructed or required Lucky Shift to destroy the raw video footage relating to the Defendants in

this action.").  The Court does not believe that a reasonable jury could somehow conclude that

---

[7] The Court notes that the purpose of this motion was to determine what recordings existed and who was in possession of those recordings.  Nevertheless, no motion was made to specifically preserve the evidence.

this destruction was an attempt by Mannina to cover up the fact that she had coached the eyewitnesses. [8]

Further, while it may have been the "best practice" to record the *entire* interview, it is not reasonable to infer from the fact that Mannina failed to do so that she was engaging in questionable interview techniques.  From her own deposition, the only question Mannina asked that was not captured by the recording was whether or not the witnesses could even identify someone from the photo array. *See* dkt. no. 190-1 at 63:6-65:7.  This way, Mannina did not record an interview that would be useless to her because no identification was made.  Hart also cites several International Association of Chiefs of Police ("IACP") standards that Mannina allegedly did not adhere to. *See* dkt. no. 191-15.  While it is unclear to the Court what the significant of these standards are—i.e., whether IMPD required their officers to abide by these standards when interviewing witnesses—the Court is not persuaded that Mannina's failure to adhere to them leads to the conclusion that she coached the witnesses or that she knew their identifications are otherwise unreliable.  The Seventh Circuit has so concluded:

> The sort of inconsistencies to which [the plaintiff] points are normal . . . Police don't always follow correct procedure . . . If these were sufficient to permit second-guessing and damages, then the job of policing would be very risky financially as well as physically.  Police would respond by disbelieving witnesses (or not acting on allegations), lest they end up paying damages, and the public would suffer as law enforcement declined . . . everyone is entitled to protection from crime, and that protection would erode if the arrested person could collect from the police every time a civil jury concludes that it would have handled the incident differently.  That's why we have held that the sort of inconsistencies and glitches that characterize real investigations do not disentitle police to rely on eyewitness statements.

---

[8] Accordingly, the Court declines Hart's request that it "deny summary judgment on this claim as a sanction for Defendants' spoliation of that evidence." Pl.'s Response at 29.

*Askew v. City of Chicago*, 440 F.3d 894, 896-97 (7th Cir. 2006).  In short, the evidence of record does not support a finding that Mannina knowingly, or with a reckless disregard, submitted the probable cause affidavit based on unreliable eyewitness identifications.

### 2.   *Omissions of material, exculpatory evidence*

Hart's next claim hinges on certain omissions that Mannina made—he argues that Mannina "failed to include the material exculpatory facts known to [her]." Pl.'s Response at 26. Hart identifies the following omissions:

- The photo array presentation was not recorded, and otherwise failed to adhere to police best practices for avoiding misidentifications;

- At least three of the witnesses initially doubted they would be able to identify Duane's shooter;

- The witnesses had a limited opportunity to view Duane's shooter;

- The witnesses' descriptions of Duane's shooter were inconsistent with regard to one another, with regard to Hart, and with regard to surveillance images of Duane's shooter; and

- At least one of the witnesses, Bluiett, expressed his uncertainty about his identification of Hart when he was presented with Photo Array No. 86814.

Pl.'s Response at 33.  These omissions are material if their "inclusion would have negated probable cause." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (citing *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984)).  The Seventh Circuit has thus condoned the practice of using a "hypothetical affidavit" to ask, "whether a hypothetical affidavit that included the omitted material would still establish probable cause." *Id.* (quoting *United States v. Robinson*, 546 F.3d 884, 888 (7th Cir. 2008)).  The Court will thus examine each alleged exculpatory fact to see if its inclusion would have negated probable cause.

The Court has already discussed Mannina's failure to record the entire interview, as well as her failure to adhere to "police best practices."[9]  Even if the judge knew the entire interview was not recorded and/or that Mannina failed to adhere to certain IACP standards, the Court does not believe this would have negated probable cause.

In regard to Hart's second piece of exculpatory evidence, the Court does not agree that the witnesses told the police that they wouldn't be able to identify the shooter.  For example, when asked if she would be able to recognize the shooter again if she saw him, Glasscock responded "I'm not sure." Dkt. No. 190-7 at 10.  This is not the same as stating, for example, "I will not be able to identify the shooter in the future."  Similarly, while Daniels stated that the hoodie covered some of the shooter's face, she was still able to identify his skin color and the fact that he was wearing glasses—she also never expressed that she would not be able to identify the shooter. *See* Dkt. No. 109-10 at 5-6.  Bluiett also specifically said he had seen the man without the mask on recently, belying any claim made by Hart that Bluiett said he wouldn't be able to identify the shooter. Dkt. No. 190-3 at 10.  The Court agrees with Mannina that "[a] victim, initially uncertain, may be certain when faced with a photo of their attacker." Def. Reply at 19.  In the transcripts of their identifications, not one of the four witnesses expresses any doubt in their identification of Hart.  As such, the Court does not agree that this was exculpatory evidence that was wrongly omitted.

Hart next argues that Mannina should have included the fact that the witnesses only had a limited opportunity to view Duane's shooter.  However, "limited" is completely relative. Certainly, the witnesses did not have the chance to study the shooter's face over a lengthy period of time—Hart notes that the entire encounter lasted just over two minutes. *See* Pl.'s Response at

---

[9] The Court presumes that "police best practices" refers to the IACP standards.

17; *see also* dkt. no. 190-15 (noting "two suspects enter the residence . . . and a few seconds later

we saw the suspects run out the front door").  Nevertheless, Glasscock stated that the suspect got

within inches of her face, the surveillance video reflects Bluiett leading the men into the home,

and Duane and Daniels were able to view the shooter while Duane was having a verbal exchange

with him.  All of the witnesses subsequently identified Hart, giving Mannina sufficient probable

cause to support her affidavit for his arrest.  Riddling the affidavit with these details would not

have negated probable cause as Hart suggests. *See Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir.

2004) ("[S]o long as a reasonably credible witness or victim informs the police that someone has

committed . . . a crime, the officers have probable cause to place the alleged culprit under

arrest.").

Further, the Court disagrees that the descriptions given by the witnesses were *inconsistent*

with Hart's actual description or that of the man in the surveillance video.  The witnesses

identified the suspect as a black male, measuring 5'7 to 5'10 in height, wearing glasses[10] and a

dark-colored sweatshirt,[11] and ranging in age from early twenties to early thirties. *See* dkt no.

179-1 ¶ 15; dkt. no. 179-2 ¶ 22; dkt. no. 179-3 ¶ 14; and dkt. no. 179-4 ¶ 21.  Save for his age,[12]

the description matches Hart's and that of the suspect in the surveillance video.  Regardless, this

---

[10] The Court notes that Hart incorrectly states that Daniels said the shooter wore sunglasses. *See* Pl.'s Response at 28.  Daniels stated the shooter wore sunglasses *or* glasses. *See* dkt. no. 190-10 at 5.

[11] Again, Hart takes issue with the fact that Duane said the shooter wore a jacket, while the surveillance video shows the man not wearing a jacket. Pl.'s Response at 28.  This is a mischaracterization of what Duane said in his statement to police.  It appears to the Court that Duane interchangeably used the words "sweatshirt" and "jacket."  *See* dkt. no. 190-5 at 13.  Regardless, the Court does not find this to be material or inconsistent.

[12] Hart also argues that the surveillance video shows the shooter has facial hair, but that immediately prior to the Miller Incident, he did not.  In support, he cites his own affidavit, stating on October 29, 2008, he did not have facial hair. *See* dkt. no. 191-14 ¶ 2.  The Court notes that this is five days before the Miller Incident occurred, perhaps enough time to grow facial hair.  Accordingly, the Court does not find this evidence to be persuasive or material.

discrepancy does not defeat probable cause. *See Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) ("[T]he alleged discrepancies between [the victim's] original description of her attacker and [the plaintiff's] appearance on the evening of his arrest do not affect our inquiry into whether [the Detective's] actions were objectively reasonable[.]"); *see also Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999) ("We refuse to require law enforcement officers to delay arresting a suspect until after they have conclusively resolved each and every inconsistency or contradiction in a victim's account.").

Finally, Hart argues that Mannina should have included the fact that Bluiett expressed his uncertainly about his identification of Hart when presented with the photo array. First, the Court does not agree that the evidence suggests Bluiett expressed his concern at the time he made the identification.[13]  Rather, the evidence suggests that he became uncertain of his identification as trial approached.  Therefore, Mannina would have had no knowledge *at the time she submitted the probable cause affidavit* that Bluiett was uncertain.  However, even if Bluiett was initially unsure of his identification of Hart, this would not have defeated probable cause for Hart's arrest as there were three other eyewitnesses who identified Hart as the suspect.

Accordingly, the Court finds that Mannina did not knowingly, intentionally, or with reckless disregard for the truth, omit any exculpatory information that, if included, would have negated probable cause.  As such, the Court **GRANTS** Mannina's motion for summary judgment with respect to Count I in Hart's third amended complaint.

---

[13] Hart relies on an email sent to Pauline Mason regarding the *Brother's Keeper* episode to support his claim that Mannina knew Bluiett was unsure of his identifications.  The email contains notes on how to further edit the episode for air, and it contains the following notation: "Ricky's ID of Swavely:  delete 'that's the closest', keep 'definitely' or pull other verite from just after this when chris asks him to clarify[.]" Dkt. No. 190-57 at 3.  This, therefore, may be evidence to suggest Bluiett was not sure of his identification of Swavely, but does not lend any support to the claim that Bluiett was unsure of his identification of Hart.

### 3. Probable cause for Hart's arrest

In Count II of Hart's third amended complaint, he argues that Mannina arrested him for the Miller Incident without probable cause.  It is well-established that if probable cause existed for an arrest, no Fourth Amendment violation occurred. *See Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 878 (7th Cir. 2012) ("Indeed, if [the Sherriff Deputy] actually did have probable cause to arrest [the plaintiff], 'then a Fourth Amendment claim for false arrest is foreclosed.'") (quoting *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 679-80 (7th Cir. 2007)).  "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)).  The Seventh Circuit has stated that "it does not take much to establish probable cause." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) (citing *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)).  While "[t]he officers must have more than a bare suspicion that they have the right guy, [] they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Id.* The Court agrees that Mannina had probable cause to arrest Hart based on the facts and circumstances known to her at the time of his arrest.

At the time of his arrest, Mannina had four separate eyewitnesses to the crime independently identify Hart as the man who shot Duane on the night of the Miller incident—this is certainly sufficient to supply probable cause for an arrest. *See Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) ("So long as an officer reasonably believes the putative victim of or eyewitness to a crime is telling the truth, he may rely on the information provided to him by such

persons in deciding to make an arrest, without having to conduct an independent investigation

into their accounts.") (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006)).

It is well-established that "[w]hen police officers obtain information from an eyewitness or

victim establishing the elements of a crime, *the information is almost always sufficient to provide*

*probable cause for an arrest* in the absence of evidence that the information, or the person

providing it, is not credible." *Pasiewicz v. Lake Cnty. Forest Pres. Dist.*, 270 F.3d 520, 524 (7th

Cir. 2001) (emphasis added).

Nevertheless, Hart argues that these identifications were unreliable for four reasons:  1)

the witnesses' descriptions were inconsistent with Hart's actual description; 2) the witnesses

originally told Mannina they likely would not be able to identify the person who shot Duane; 3) a

jury could reasonably conclude that Mannina coached or led the witnesses to identify Hart; and

4) Mannina knew or should have known that the witnesses colluded to identify Hart. *See* Pl.'s

Response at 30.  These are the same reasons that the Court addressed, and found to be

insufficient, above.  The Court finds that probable cause existed for Hart's arrest.[14]  As such,

Mannina's motion for summary judgment on Count II of Hart's third amended complaint is

**GRANTED**.

### D.  Defendant Officers Mannina and Moore - Speedy Trial

Mannina and Moore argue that they are entitled to summary judgment on Count V of

Hart's third amended complaint because they did not deny Hart a speedy trial.  The Sixth

Amendment guarantees an accused "the right to a speedy and public trial." U.S. Const. amend

---

[14] Mannina also argues that Deputy Prosecutor Robinson's screening of the case provided probable cause for Hart's arrest because she independently concluded there was enough evidence to arrest him.  The Court need not address the merits of this argument as the Court concludes that the four eyewitness identifications provided probable cause for his arrest.

VI. Hart's Sixth Amendment claim is flawed in several aspects. First, the Seventh Circuit does not recognize a denial of a speedy trial claim once charges are dismissed:

> The defendant maintains that because he was originally indicted in February of 1980, but did not go to trial till March 22, 1982, he was denied his Sixth Amendment right to a speedy trial. This argument, however, ignores the fact that for twenty months of this period, no charges were pending against the defendant. *The Speedy Trial Clause applies only to an accused; when charges were dismissed in Iowa, the defendant lost not only the status of being an accused, he lost the Sixth Amendment's guarantee of a prompt trial. It is scarcely realistic to suppose that a citizen, free from criminal charges, wants or deserves a speedy trial.* Once all counts of the indictment were dismissed, the defendant was legally and constitutionally in the same posture as though no charges had been made.

*United States v. Samples*, 713 F.2d 298, 301 (7th Cir. 1983) (internal citations and quotations marks omitted) (emphasis added); *see also United States v. MacDonald*, 456 U.S. 1, 8 (1982) ("Once charges are dismissed, the speedy trial guarantee is no longer applicable."). Secondly, and similarly, as the Defendants suggest, monetary damages are not available for Hart, as the typical remedy for a Sixth Amendment speedy trial violation is dismissal of the charge. *See Barker v. Wingo*, 407 U.S. 514, 522 (1972) ("The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived . . . *Such a remedy . . . is the only possible remedy*.") (emphasis added).[15] The Court therefore **GRANTS** Mannina and Moore's motions for summary judgment on Count V in Hart's third amended complaint.

---

[15] The Court does not agree with Hart that *Blake v. Katter*, 693 F.2d 677 (1982) stands for the proposition that "that Seventh Circuit subsequently recognized Section 1983 claims for violations of criminal defendants' right to a speedy trial[.]" Pl.'s Response at 33. While the Court did reverse the district court's denial of Blake's speedy trial claim, it expressed no opinion whatsoever regarding the possible recovery of monetary damages. It simply noted that at the motion to dismiss stage, "no clear reason ha[d] been shown for the seventh month delay" and it was therefore premature for the district court to dismiss the claim. *Id.* at 682.

### E.  Supervisory Liability – Defendants Breedlove, Kelly, and Benjamin ("the Defendant Supervisors")

Hart argues that the Defendant Supervisors are liable for the alleged unconstitutional conduct of Mannina and Moore because they "knew of and facilitated, approved, condoned, or turned a blind eye to" it.  "In order for a supervisor to be liable, they must be 'personally responsible for the deprivation of the constitutional right.'" *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)).  Because the Court found no constitutional violations above, the Defendant Supervisors cannot be liable. *See Matthews*, 675 F.3d at 708 ("Additionally, Greenlee [the officer] had probable cause to arrest Matthews and Gillespie [the plaintiffs], which means there was no constitutional violation for Anderson [the supervisor] to condone.").  Accordingly, the Court **GRANTS** Defendants Breedlove, Kelly, and Benjamin's motions for summary judgment on all counts against them in Hart's third amended complaint. [16]

### F.  *Monell* Claims against Defendants the City, the Department of Public Safety ("the Department"), Mayor Ballard, Director Riggs, and Chief Hite

Finally, the Defendants argue they are entitled to summary judgment on Hart's *Monell* claims.  To begin, the Defendants argue that Hart's official capacity claims against Officer Mannina, Officer Moore, Sgt. Breedlove, Lt. Kelly, Deputy Chief Benjamin, Chief Hite, Director Riggs, and Mayor Ballard are redundant as "[a]n official capacity suit is tantamount to a claim against the governmental entity itself." *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008) (quoting *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007)).  Because Hart has named the City and the Department as Defendants, his official capacity claims are redundant and unnecessary.  The official capacity suits are therefore **DISMISSED**.

---

[16] Because the Court found no constitutional violation, it need not address the Defendants' qualified immunity defense.

Turning to the claims against the City and the Department, a municipality may be liable under § 1983 "if the unconstitutional act complained of is caused by:  (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Hart's third amended complaint sets forth two different theories for imposing municipal liability:  1) an official policy and/or custom claim; and 2) a failure to train claim.  Each of these will be addressed below.

### 1.  Official policy and/or custom

Hart has brought a *Monell* claim against the City and the Department for maintaining "policies and/or customs . . . that enabled the Defendant Detectives to violate the constitutional rights of Hart." Complaint ¶ 68.  The Supreme Court has noted that "neither *Monell v. New York City Dept. of Social Services*, nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (internal citation omitted).

The Seventh Circuit has very narrowly interpreted *Heller*, delineating the following rule: "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010).  In *Thomas*, a pretrial detainee died from meningitis just a few days after being admitted to the Cook County Jail.  His mother brought a § 1983 claim against the county, sheriff, and various officers for deliberate indifference to her son's medical needs.  The Seventh Circuit concluded that while a jury might find that the county employees were not

25

*deliberately indifferent* to her son's medical needs, it could still find liability for the county for maintaining a policy that prevented the employees from responding properly. *Id.* [17]

In this case, Hart has not brought a deliberate indifference claim—a claim that requires a certain culpable mindset. Hart's *Monell* claims are wholly contingent on the alleged unconstitutional actions taken by Mannina and Moore. However, the Court has found that no underlying constitutional violations occurred by the actions taken by Defendants Mannina and Moore—there was no misleading probable cause affidavit, probable cause existed for his arrest, and no speedy trial right was violated. As such, no liability can be placed on the City or the Department.

### 2. Failure to train

Finally, Hart asserts in his third amended complaint that "the IMPD, the IPSD, and the City of Indianapolis . . . failed to instruct, supervise, control, and/or discipline, on a continuing basis, Defendant Detectives in the performance of their duties[.]" Complaint ¶ 74. However, "there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Because the Court found that no constitutional violations occurred above, no municipal liability can be imposed on the City or the Department. Accordingly, the Court **GRANTS** summary judgment in favor of the City and the Department on all counts against them in Hart's third amended complaint.

---

[17] The Court in *Heller* also noted the same with respect to qualified immunity. If a defendant officer raised that defense during trial, a jury could find that the officer did violate the plaintiff's constitutional rights but that the officer nevertheless acted in good faith. It would not, therefore, be inconsistent for a jury to impose liability on a municipality if the constitutional violation was due to a policy or custom. *See Heller*, 475 U.S. at 798-99.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' motion for summary judgment (dkt. no. 176)

is **GRANTED** in its entirety.

SO ORDERED:  01/15/2014

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication